# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 01-3677

_____

Jack Kushner, Travis Q.
Richardson, Eric Green, Samuel
Halkias, Norman M. Lyons, James
M. Swedenberg, Christopher R.
Stang, Florence D. Wiener, Jules A.
Wiener, Marc Shechtman,

          Appellants,

    v.

Beverly Enterprises, Inc.; David R.
Banks; Boyd W. Hendrickson;
Scott M. Tabakin; Pamela H.
Daniels,

          Appellees.

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

Appeal from the United States
District Court for the
District of Arkansas.

_____

Submitted: April 18, 2002
Filed: January 23, 2003

_____

Before HANSEN, Chief Judge, McMILLIAN and JOHN R. GIBSON,[1] Circuit
    Judges.

_____

_____

[1]Judge John R. Gibson recused himself from further participation in this case
following oral argument and did not participate in the decision. Pursuant to 8th Cir.
R. 47E, the two remaining judges on the panel have decided the case.

HANSEN, Circuit Judge.

Investors Jack Kushner, Travis Q. Richardson, Eric Green, Samuel Halkias, Norman M. Lyons, James M. Swedenberg, Christopher R. Stang, Florence D. Wiener, Jules A. Wiener, and Marc Shechtman (collectively "the investors") brought this securities fraud suit against Beverly Enterprises, Inc. (Beverly) and its directors David R. Banks, Boyd W. Hendrickson, Scott M. Tabakin, and Pamela H. Daniels. The district court[2] dismissed the investors' second amended complaint for failure to state a claim upon which relief could be granted. The investors now appeal, and we affirm the dismissal of their complaint.

I.

We review de novo the district court's decision to dismiss the complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Florida State Bd. of Admin. v. Green Tree, 270 F.3d 645, 661 (8th Cir. 2001). The Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (the Reform Act), however, dictates a modified analysis due to its special heightened pleading rules. As always, we must view the factual allegations in the light most favorable to the plaintiff, Parnes v. Gateway 2000, Inc., 122 F.3d 539, 546 (8th Cir. 1997), but at the same time, in the context of securities fraud, we must "disregard 'catch-all' or 'blanket' assertions that do not live up to the particularity requirements of the [Reform Act]," Green Tree, 270 F.3d at 660.

Beverly owns and operates numerous health care facilities throughout the United States and participates in the Medicare reimbursement program. In 1995, a private person instituted a qui tam action against Beverly in federal court in Arizona.

---

[2]The Honorable Stephen M. Reasoner, United States District Judge for the Eastern District of Arkansas.

On July 23, 1998, the company publicly disclosed that it was the subject of an investigation by the federal government relating to its compliance with the Medicare program. After the public announcement of the government investigation, Beverly's stock price plummeted, resulting in substantial losses for investors who had purchased stock at higher prices. In November 1998, Beverly announced that the civil investigation had been expanded to a criminal investigation by a grand jury in San Francisco and that two former employees were identified as the targets of the investigation.

The investors brought this securities fraud suit in 1998 both individually and purporting to represent a class of all persons who purchased common stock and convertible debentures of Beverly from October 19, 1995, through July 23, 1998. They claimed that Beverly and its directors had engaged in fraudulent representations that affected the purchase or sale of securities in violation of the Securities Exchange Act. Count I of the second amended complaint alleges that Beverly and the named individual officers violated Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) and 78t (1994), and Rule 10b-5, 17 C.F.R. § 240.10b-5, by knowingly making false and misleading statements that caused the investors to purchase stock at artificially inflated prices. The complaint asserts that at the direction of senior officers, Beverly falsified daily nurses' sign-in sheets by requiring the nurses to record only the total number of hours worked. Subsequently, the director of nursing would allocate the time between Medicare patients and non-Medicare patients pursuant to a set formula or a targeted number of hours, heedless of the actual time that nurses spent caring for Medicare patients. Thus, the resulting Medicare reimbursement for nursing time spent on Medicare patients was artificially inflated. The complaint alleges that as a result of this fraudulent scheme, the company's financial statements overrepresented Beverly's true earnings to the detriment of investors, and its statement of compliance with Medicare laws was false and misleading.

Count II of the second amended complaint asserts that the individual defendants are liable as "controlling persons" within the meaning of Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), because they allegedly controlled the policies of overcharging Medicare as well as the content of the public statements that misled investors. In August 1999, Beverly announced that it had reached a tentative settlement with the government resolving the civil investigation by agreeing to "reimburse" the government $170 million based upon fraudulent nursing claims from the years 1990 to 1998. (J.A. at A-34.) The second amended complaint, filed in September 1999, referenced this settlement of the civil suit.

Beverly and the individual defendants moved to dismiss for failure to state a claim, maintaining that the second amended complaint lacked sufficient particularity and the required strong inference of scienter necessary to state a claim of securities fraud. Specifically, the defendants asserted that the complaint lacked any allegation that they knew of Medicare violations or that the company's financial statements were overrepresented at the time they stated that the company was in compliance with Medicare laws and filed the financial statements.

The investors attached a criminal plea agreement to their supplemental opposition to the motion to dismiss in an attempt to demonstrate knowledge or recklessness. In February 2000, Beverly Enterprises–California, a wholly owned subsidiary of Beverly, entered into a plea agreement with the government, admitting that it had submitted ten false claims to Medicare. The California subsidiary admitted to calculating nursing costs based on prescribed formulas which ensured revenue levels rather than being based on actual Medicare nursing costs and agreed to pay a criminal fine of $5 million. Defendant Banks signed the plea agreement on behalf of the California subsidiary. In exchange for the plea, the government agreed not to file any more charges against the California subsidiary or its parent corporation based on nursing costs from 1992 through 1998. The plea agreement admits no wrong on the part of the parent corporation and implicates no wrongdoing on the part of any

4

individually named defendant. The defendants did not object to the district court considering this document.

The district court granted the motion to dismiss for failure to state a claim. The court also denied the investors' second motion to take judicial notice of certain documents. The investors appeal.

## II.
### A. Securities Fraud and Controlling Person Claims

The district court concluded that the second amended complaint failed to state a claim of securities fraud because the complaint failed to allege scienter to the level required by existing law, that Beverly's opinion regarding the legality of its billing practices under Medicare regulations was "soft information" which it had no duty to disclose, and that the case involved fraud on the part of a handful of employees at a handful of facilities, as demonstrated in the criminal plea agreement, rather than a company-wide scheme to engage in federal securities fraud. Then, finding no stated claim of securities fraud, the district court concluded that the "controlling person " claim necessarily failed as well.

"Rule 10b-5, promulgated by the Securities and Exchange Commission under section 10(b) of the Act, prohibits fraudulent conduct in the sale and purchase of securities," and section 20 extends liability for this conduct to any "controlling person." In re Navarre Corp. Sec. Litig, 299 F.3d 735, 741 (8th Cir. 2002) (citing 15 U.S.C. §§ 78j, 78t(a); 17 C.F.R. § 240.10b-5). "Complaints brought under Rule 10b-5 and section 10(b) are governed by special pleading standards adopted by Congress in the [Reform Act]. These pleading standards are unique to securities and were adopted in an attempt to curb abuses of securities fraud litigation." Navarre Corp., 299 F.3d at 741.

Congress enacted two heightened pleading requirements in the Reform Act. First, the Reform Act requires the plaintiff's complaint to specify each misleading statement or omission and specify why the statement or omission was misleading. 15 U.S.C. § 78u-4(b)(1) (Supp. IV 1998). If the allegation "is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." Id. Similarly, Rule 9(b) of the Federal Rules of Civil Procedure has long required that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The text of the Reform Act was designed "to embody in the Act itself at least the standards of Rule 9(b)." Greebel v. FTP Software, Inc., 194 F.3d 185, 193 (1st Cir. 1999).

Second, Congress stated in the Reform Act that a plaintiff's complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); Green Tree, 270 F.3d at 654. The Reform Act requires the court to dismiss the complaint if these requirements are not met. 15 U.S.C. § 78u-4(b)(3). "[U]nder the Reform Act, a securities fraud case cannot survive unless its allegations collectively add up to a strong inference of the required state of mind." Green Tree, 270 F.3d at 660.

> "Congress has effectively mandated a special standard for measuring whether allegations of scienter survive a motion to dismiss. While under Rule 12(b)(6) all inferences must be drawn in plaintiffs' favor, inferences of scienter do not survive if they are merely reasonable . . . . Rather, inferences of scienter survive a motion to dismiss only if they are both reasonable and 'strong' inferences."

Id. (quoting Greebel, 194 F.3d at 195-96) (alterations in original).

The alleged false and misleading statements that form the basis for this suit are taken from Beverly's filings with the Securities and Exchange Commission (the SEC) for the years 1994 through 1998, which are signed by the directors. In those filings,

6

the company stated a belief that its facilities were in substantial compliance with the Medicare regulatory requirements. The company also reported its revenues to the SEC and stated that its financial results conformed with generally accepted accounting principles (GAAP). The investors assert that these statements were misleading because the company was actually engaged in a scheme of falsifying Medicare nursing costs, contrary to the statement of compliance, and that this scheme materially and artificially inflated the company's reported revenue in its financial statements. Also, the investors assert that, contrary to the statement of compliance with GAAP, Beverly had not established any financial reserves for reimbursing Medicare or paying penalties associated with the overstated nursing costs as GAAP would require.

## 1. Scienter

The investors first contend on appeal that the district court erred by concluding that the complaint failed to plead facts giving rise to a strong inference of the required state of mind, or scienter. "Scienter means the intent to deceive, manipulate, or defraud." Green Tree, 270 F.3d at 653 (internal quotations omitted). Although the Reform Act's heightened pleading rules require a showing of a "strong inference" of scienter, Congress did not codify any particular methods of satisfying that requirement. Id. at 659-60. Thus, we believe that the Reform Act was not intended to alter the substantive nature of the scienter requirement, and our prior case law on the issue remains instructive. Id. at 653 & n.7.

In general, inferences of scienter tested under the Reform Act will not survive a motion to dismiss if they are only reasonable inferences–the inferences must be "'both reasonable and strong.'" Helwig v. Vencor, Inc., 251 F.3d 540, 551 (6th Cir. 2001) (en banc) (quoting Greebel, 194 F.3d at 195-96), cert. dismissed, 122 S. Ct. 2616 (2002). Cases from other circuits suggest that a strong inference of the required scienter may arise where the complaint sufficiently alleges that the defendants (1)

7

benefitted in a concrete and personal way from the purported fraud, (2) engaged in deliberately illegal behavior, (3) knew facts or had access to information suggesting that their public statements were not accurate, or (4) failed to check information they had a duty to monitor. Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir.), cert. denied, 531 U.S. 1012 (2000). "[W]e look to how other circuits have interpreted the strong-inference-of-scienter language as valuable guidance about what factors help to establish such an inference, but take care to use subsidiary formulae as an aid to interpreting the strong-inference standard and not as a substitute for it." Navarre, 299 F.3d at 746 (internal quotations omitted).

The allegations of scienter in the investors' second amended complaint do not raise a strong inference of the required state of mind. The second amended complaint charges that the defendants were generally aware that noncompliance with Medicare regulations would result in serious fines and penalties, and asserts broadly that "Beverly" inflated the payments due from Medicare by falsifying daily nursing time sheets. However, the second amended complaint makes no particular assertion of which defendant was responsible for which statement or omission, or how any defendant participated in the alleged scheme. But cf. In re Cabletron Sys., Inc., 311 F.3d 11, 39 (1st Cir. 2002) (holding a petition survived dismissal where scienter allegations included large-scale fraudulent practices over time as well as specific allegations of knowledge and actions by specific officers). The complaint makes the blanket assertion that "the defendants designed and implemented the policies of improper allocation of nursing costs " (J.A. at A-29), and that the "[d]efendants had actual knowledge of the misrepresentation" (id. at A-35). Without allegations of particular facts demonstrating how the defendants knew of the scheme at the time they made their statements of compliance, that they knew the financial statements overrepresented the company's true earnings, or that they were aware of a GAAP violation and disregarded it, a showing in hindsight that the statements were false does not demonstrate fraudulent intent. "Mere allegations of fraud are insufficient." Navarre, 299 F.3d at 742. "[R]ote allegations that the defendants knowingly made

8

false statements of material fact" fail to satisfy the heightened pleading standard of the Reform Act. Id. at 745.

Even the most specific statements of the second amended complaint fail to demonstrate a strong inference of scienter. The second amended complaint asserts that the formula for weighted nursing hours was prepared at corporate headquarters and reviewed by "senior officers." (J.A. at A-29.) Also, in one California facility, the administrator allegedly received his instructions from Carol Tomey, who was responsible for four other California facilities and who received her instructions as to the amount of nursing hours to record from William Mathias, Executive Vice President of Beverly Enterprises, who "reported to Defendant Banks."[3] (Id. at A-22.) Banks is the only named defendant referred to, and the assertion that someone who may have been involved in the scheme "reported" to him is not specific enough to support a strong inference that he knew of or participated in the fraudulent practice while it was occurring. "'Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonabl[y] available to them.'" Navarre, 299 F.3d at 743 (quoting Novak, 216 F.3d at 309).

The investors attempt to make out a strong inference of scienter based upon circumstantial evidence–namely, that it was reckless for the defendants not to know of the scheme given its sheer size and its effect on the company's core business. We have previously concluded that the Reform Act did not alter the substantive nature of the scienter requirement, which we have defined as including a measure of recklessness. Green Tree, 270 F.3d at 653. Specifically, scienter may be demonstrated by severe recklessness involving "highly unreasonable omissions or misrepresentations" amounting to "an extreme departure from the standards of

---

[3]While the investors' brief asserts that Banks directed his immediate subordinate to pass the instructions to the regional administrators regarding this scheme, this allegation is not presented in the complaint.

ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." K & S P'ship v. Cont'l Bank, N.A., 952 F.2d 971, 978 (8th Cir. 1991) (internal quotations omitted), cert. denied, 505 U.S. 1205 (1992). Recklessness, then, may be shown where unreasonable statements are made and the danger of misleading investors is so obvious that the defendant must have been aware of it. Id. "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." Novak, 216 F.3d at 308. Also, recklessness is shown where alleged facts demonstrate that the defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud. Id.

The second amended complaint asserts that the defendants were reckless in disregarding information reasonably available to them. See Navarre, 299 F.3d at 746 ("One 'classic' fact pattern giving rise to a strong inference of scienter is that defendants made statements when they knew or had access to information suggesting these public statements to be materially inaccurate."). The complaint asserts that the amount Beverly claimed from Medicare for reimbursement of nursing services on a per patient day "was significantly greater than comparable facilities operated by other companies." (J.A. at A-23.) A chart attached to the second amended complaint illustrates that Beverly's ratio of Medicare to non-Medicare nursing costs was higher than state averages in California or elsewhere in the nation. The chart is unavailing because there is no assertion that the defendants had access to it or to the synthesized information it contained and chose to disregard it at the time the statements of compliance were made.

The complaint also states that the individual defendants agreed upon the annual budgets, which predetermined the amount of Medicare reimbursements to be charged by each facility, and that the formula for each facility's targeted number of Medicare

10

nursing hours "was prepared at corporate headquarters, reviewed by senior officers, and communicated to administrators at each facility." (Id. at A-29.) Noticeably lacking is any assertion that the defendants knew that the budgeted Medicare hours were being met fraudulently. "There are limits to the scope of liability for failure adequately to monitor the allegedly fraudulent behavior of others." Novak, 217 F.3d at 309. For example, "the failure of a parent company to interpret extraordinarily positive performance by its subsidiary . . . as a sign of problems and thus to investigate further does not amount to recklessness under the securities laws." Id. It is telling to us that Beverly's outside auditors did not question its accounting practices and that Beverly received no warning letters from the SEC or Medicare concerning its practices during the class period. In our opinion, the assertions in the second amended complaint do not demonstrate a fraudulent scheme that was so obvious the defendants must have been aware of it or acted in such a reckless way as to not discover it.

The investors would have us infer that the scheme was widespread throughout the company and known by the defendants because of the sheer size of the civil settlement ($170 million), which required the repayment of approximately five years of company profits. In support, they cite Green Tree, where, after determining that the defendants had had knowledge that crucial information in their financial statements was based on discredited assumptions, we concluded that "the sheer size of the $390 million write-down adds to the inference that the defendants must have been aware the problem was brewing." 270 F.3d at 666. In the present case, the "sheer size" of the civil settlement is not accompanied as it was in Green Tree by a showing that the defendants had knowledge of contradictory crucial information at the time that they made their statements of compliance with Medicare regulations. Thus, we conclude that the sheer size of the settlement alone is insufficient in the present case to meet the Reform Act's heightened pleading standards.

11

The guilty plea of the California subsidiary was limited in scope to wrongful conduct by a handful of employees and does not indicate a company-wide scheme of which the defendants should have known. Furthermore, the guilty plea cannot be used to demonstrate knowledge by hindsight. "The purpose of [the Reform Act's] heightened pleading requirement was generally to eliminate abusive securities litigation and particularly to put an end to the practice of pleading fraud by hindsight." Navarre, 299 F.3d at 742 (internal quotations omitted). We agree with the district court that the guilty plea admits nothing more than the limited instances of misconduct specified therein.

The investors would have us infer knowledge of a company-wide scheme to defraud Medicare from assertions in the government's criminal sentencing memorandum in the criminal case against the California subsidiary. We will not consider this document in opposition to the defendants' motion to dismiss this civil suit. The government's sentencing memorandum is a position paper offered here by the investors for the truth of the matters asserted therein, which the defendants dispute. Such disputed papers should not be the subject of judicial notice on a motion to dismiss. See Fed. R. Evid. 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute . . . ."); see also Green Tree, 270 F.3d at 663 (noting that courts have taken judicial notice of SEC filings if not offered for the truth of the matters asserted therein).

The investors also point to allegations of motive to demonstrate scienter, asserting that the individual defendants received additional incentive compensation if the company's financial performance was enhanced. "[M]otive and opportunity are generally relevant to a fraud case, and a showing of unusual or heightened motive will often form an important part of a complaint that meets the Reform Act standard." Green Tree, 270 F.3d at 660. We have said that "in some cases the same circumstantial allegations that establish motive and opportunity also give additional reason to believe the defendant's misrepresentation was knowing or reckless." Id.

12

Specifically, the investors assert that in 1996, the defendants Banks, Hendrickson, and Tabakin together received performance plan awards totaling over $1.7 million. In 1997, Banks received a $630,000 bonus under the performance plan and Banks, Hendrickson, and Tabakin received options to purchase shares of company stock. The complaint also asserts that the local administrators received incentive bonuses for meeting the pre-formulated targets.

Pleading the simple fact "that a defendant's compensation depends on corporate value or earnings does not, by itself, establish motive to fraudulently misrepresent corporate value or earnings." Id. at 661. In Green Tree, we held that the magnitude of an executive's compensation and performance-based earnings ($102 million in 1996), together with the coincidental timing of the company overstating its earnings for 1996, which happened to be the last year of the executive's lucrative contract, provided a heightened showing of motive to commit fraud. Id. After Green Tree restated its earnings for that year, the executive was required to repay $25.9 million of his 1996 bonus. Id. The allegations of personal gain in the present case do not approach the magnitude of compensation involved in Green Tree, and the suspicious circumstances there present (such as the executive's expiring contract coinciding with the company's overstatement of earnings) are also lacking here. The awards of stock options do not indicate a motive for fraud because there is no assertion of insider trading or lucrative stock sales during the class period. The defendants' stock would have been affected by the same downturn in prices as were the investors' stocks. Thus, the allegations of personal gain here do not demonstrate a heightened motive to commit fraud.

The second amended complaint fails to demonstrate a strong inference of scienter and thus fails to state a claim of securities fraud under the Reform Act's standards. Because the securities fraud claim fails, the controlling person claim fails as well.

13

## 2. Soft Information

The district court also found that the statements of compliance with Medicare regulations were not actionable because they were based on "soft information," which the company was not required to disclose. The investors argue that, once the company chose to make representations concerning Beverly's compliance with the Medicare regulations, there arose a duty to be truthful in that disclosure. We agree with this premise but not with the investors' further conclusion that the defendants' representations were untruthful.

"Before liability for non-disclosure can attach, the defendant must have violated an affirmative duty of disclosure." In re Sofamor Danek Group, Inc., 123 F.3d 394, 400 (6th Cir. 1997), cert. denied, 523 U.S. 1106 (1998). Here, the district court correctly noted that there is no duty to disclose "soft information," such as a matter of opinion, predictions, or a belief as to the legality of the company's own actions. Id. at 402. "Soft information must be disclosed only if virtually as certain as hard facts." Id. (internal quotations and alterations omitted). In Sofamor, the court held that the company was not required to publicly opine about the legality of its product promotion, noting, "The hard fact is that no regulatory action was initiated during the Class Period." Id. Opinions cease to be soft information, however, when contradicted by actual knowledge of wrongdoing. We agree with the Sixth Circuit's statement that "even absent a duty to speak, a party who voluntarily discloses material facts in connection with securities transactions assumes a duty to speak fully and truthfully on those subjects." Helwig, 251 F.3d at 561.

In this instance, the second amended complaint has not adequately pleaded that the defendants knew the statements of compliance were untruthful at the time the statements were made. Absent a clear allegation that the defendants knew of the scheme and its illegal nature at the time they stated the belief that the company was in compliance with the law, there is nothing further to disclose. The fact that a

14

defendant's belief or opinion later "prove[s] to be wrong in hindsight does not render the statements untrue when made." In re Syntex Corp. Sec. Litig., 95 F.3d 922, 934 (9th Cir. 1996). Because the second amended complaint fails to allege with particularity that the defendants knew their statements were untruthful when made, the pleading is inadequate under the Reform Act.

### 3. GAAP Violations

The second amended complaint charges that the alleged scheme to defraud Medicare artificially inflated the company's reported earnings and that the company failed to establish reserves for reimbursing Medicare for the violations, rendering false the representations that the company's financial statements were in compliance with GAAP. Allegations of GAAP violations are insufficient to state a securities fraud claim unless coupled with evidence of corresponding fraudulent intent. Migliaccio v. K-Tel Intern'l, Inc. (In re K-tel Intern'l, Inc. Sec. Lit.), 300 F.3d 881, 894 (8th Cir. 2002); Navarre, 299 F.3d at 745; Novak, 216 F.3d at 309. As already discussed, the complaint does not set forth sufficient allegations of corresponding fraudulent intent on the part of the defendants.

### B.

The investors assert that the district court erred by refusing to take judicial notice of matters of public record relating to Beverly-California, through which the investors attempted to demonstrate that the scheme to defraud Medicare involved more than the mere handful of misrepresentations admitted to in the criminal plea agreement. "When deciding a motion to dismiss, a court may consider the complaint and documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." In re Syntax Corp. Sec. Litig., 95 F.3d at 926 (internal quotations omitted). The investors seek to have the extra-record material admitted through Rule 201(b) of the Federal Rules of

Evidence, which provides that the district court may judicially notice a fact that is not subject to reasonable dispute.

The documents here are asserted in an effort to prove the truth of the matters within them and inferences to be drawn from them–matters which Beverly disputes. We have noted previously that courts have considered SEC filings on a motion to dismiss where the filings were required by law and were not offered to prove the truth of the documents' contents. Green Tree, 270 F.3d at 663 (and cases cited therein). The documents the investors seek to have judicially noticed, for the most part, are not SEC filings, they are offered for the truth of the matters asserted in them, and Beverly disputes the facts and inferences that the investors attempt to establish through these documents. Accordingly, the district court did not abuse its discretion by declining to take judicial notice of these extra-record matters. See Goff v. Burton, 91 F.3d 1188, 1192 (8th Cir. 1996) (stating standard of review).

III

We affirm the district court's dismissal of the complaint for failure to state a claim.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

16