

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-15-2004

# In Re: Alpharma Inc

Precedential or Non-Precedential: Precedential

Docket No. 02-3348

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"In Re: Alpharma Inc " (2004). *2004 Decisions.* Paper 556.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/556

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL
UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT
_____

No: 02-3348
_____

IN RE: ALPHARMA INC.
SECURITIES LITIGATION

Maverick Capital, Ltd.,

Appellant

Appeal from the United States
District Court
for the District of New Jersey
(D.C. Civil Action Nos. 00-cv-05452,
00-cv-05507, 00-cv-05508, 00-cv-05630,
00-cv-05657 and 00-cv-06267)
District Judge: Honorable Joel A. Pisano
_____
Argued on June 16, 2003

Before: ALITO, ROTH, and HALL* ,
Circuit Judges

(Opinion filed June 15, 2004)

_____

*The Hon. Cynthia H. Hall, Circuit
Judge for the United States Court of
Appeals for the Ninth Circuit, sitting by
designation.

Joseph J. DePalma, Esquire
Lite, Depalma, Greenberg & Rivas, LLC
Two Gateway Center, 12th Floor
Newark, New Jersey 07102

Marc I. Willner, Esquire   (Argued)
David Kessler, Esquire
Three Bala Plaza East, Suite 400
Bala Cynwyd, PA 19004

Counsel for Appellant

Anthony J. Marchetta, Esquire
John P. Scordo, Esquire
Pitney, Hardin, Kipp & Szuch, LLP
P.O. Box 1945
Morristown, New Jersey 07962

William H. Pratt, Esquire
Frank Holozubiec, Esquire
Wendy E. Long, Esquire (Argued)
Kirkland & Ellis
153 East 53rd Street
New York, New York 10022

Counsel for Appellees

_____

OPINION
_____

ROTH, Circuit Judge:

This case involves a proposed class action suit brought by investors who purchased shares of Alpharma, Inc., common stock between April 1999 and October 2000.  Specifically, plaintiffs allege that defendants made materially

1

false or misleading statements by reporting and then commenting on inflated revenue, net income, and earnings per share results during the proposed class period. These results are alleged to have artificially inflated the company's stock price, thereby damaging members of the proposed class.

The District Court, concluding that plaintiffs failed to state a claim for relief under federal securities laws and that granting leave to amend would be futile, dismissed the Complaint with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, we will affirm the final judgment of the District Court.

# I. Factual Background

## A. Overview

This case began as six separate proposed class actions, all of which were brought by shareholders alleging they suffered damages as a result of being induced to purchase shares of Alpharma's common stock on the basis of false or misleading statements made by the company and its top executives. On March 27, 2001, the District Court consolidated these actions, appointed Maverick Capital, Ltd., as lead plaintiff, and ordered the filing of a consolidated amended complaint

Plaintiffs filed the Consolidated Amended Class Action Complaint (the "Complaint") on June 8, 2001. In the Complaint, plaintiffs seek to represent investors who purchased Alpharma stock between April 28, 1999, and October 30, 2000. They allege that the company and four of its executives caused the issuance of materially false and misleading financial results during the proposed class period, thereby artificially inflating the value of the company's common stock. Plaintiffs further allege that these misstatements were the result of improper accounting procedures which inflated the company's reported revenue, net income, and earnings per share.

## B. Parties

As stated above, plaintiffs seek to represent a proposed class of investors who purchased shares of Alpharma stock during the class period. Defendant Alpharma, Inc., is a multinational corporation that produces pharmaceuticals for both animal and human use. Its domestic headquarters is located in Fort Lee, New Jersey. At all times relevant to the Complaint, the company's common stock traded on the New York Stock Exchange (NYSE). Alpharma sold a total of $537 million of common stock to underwriters during the class period.

Defendant Einar Sissener is Alpharma's Chairman. Sissener served as Chief Executive Officer (CEO) between June 1994 and June 1999, and then as Chairman of the Office of the Chief Executive from June 1999 to December 1999. He signed Alpharma's Form 10-K annual report for 1999. The Complaint alleges that he, together with relatives, owns sufficient voting shares to effectively control the company.

Defendant Ingrid Wiik assumed the

2

position of President and CEO in January 2000 and became a director in February 2000. She too signed the company's Form 10-K annual report for 1999. Wiik sold forty-six percent of her shares in Alpharma for a total of $839,075 during a four day period in the first week of August 2000 when the value of Alpharma's stock was near its high point of $71 per share.

Defendant Jeffrey Smith served as Alpharma's Vice President and Chief Financial Officer (CFO) at all times relevant to the Complaint. He signed the Form 10-K annual report for 1999, as well as each of the Form 10-Q quarterly reports issued during the proposed class period. During the first week of August 2000, Smith sold twenty-six percent of his holdings in the company for a total of $1,240,549.

Defendant Bruce Andrews served as president of Alpharma's Animal Health Division (AHD) during all times relevant to the Complaint. Andrews sold seventy-seven percent of his shares in the company for a total of $1,658,965 during the first week of August 2000.[1]

## C. Substantive Allegations

The primary basis for the proposed class action is plaintiffs' allegation that the financial results released by defendants during the class period were the product of accounting irregularities which caused Alpharma to report inflated revenue figures. These revenue figures, in turn, affected the accuracy of its net income and earnings per share calculations, thereby fueling an increase in the value of the company's stock during the class period.

More specifically, plaintiffs allege that the individual defendants violated both Generally Accepted Accounting Principles (GAAP) and Alpharma's own revenue recognition policy[2] by recording AHD sales as revenue even though the products sold were not shipped to customers until as long as six months after the purported sale. In practice, this meant that AHD customers had agreed to purchase Alpharma products but delayed receipt and payment until subsequent quarters. The purchased products were then put on "customer hold" and shipped to a warehouse until the customers were ready to receive and pay for them. These so-called "pre-sales" began when Andrews became president of the AHD in May 1997 and had allegedly become part of Alpharma's "corporate culture" by the beginning of the class period. As a result, plaintiffs allege that defendants either knew or recklessly disregarded the fact that (1) instances would arise in which customers would later refuse to receive and pay for orders already recognized as revenue in previous quarters, (2) they had

---

[1] Adopting the language used in the Complaint, we will refer to Sissener, Wiik, Smith, and Andrews collectively as the "individual defendants".

[2] Alpharma's revenue recognition policy stated that revenue would not be recognized until its products were shipped to customers.

failed to disclose that pre-sales essentially sapped future demand for the company's products, and (3) the use of pre-sales encouraged the creation of fictitious sales.

Alpharma restated its results for the full year 1999, each quarter during 1999, and the first two quarters of 2000 following the close of trading on the NYSE on October 30, 2000. In its press release, the company placed the blame for the overstatements on employees in the Brazil division of the AHD and noted that, after a full investigation, it was convinced that the problem had not spread beyond Brazil.[3] Prior to the announcement on

_____

[3]In connection with the press release, Wiik stated as follows:

> We are extremely disappointed by the actions of these employees who breached our established policies and controls and who violated the trust we placed in them. We have removed the individuals involved and appointed new management to run our Animal Health operations in Brazil. While we do not consider the net financial impact of this matter material to the period affected, we will restate our financial results because it is the right thing to do.

October 30, the stock traded at $56.50. By the time the NYSE closed the following day, the value of Alpharma's shares had fallen to $38.81.

In placing the blame for this drop in share price on the individual defendants, plaintiffs allege in their complaint:

> Each of the Individual Defendants by virtue of his or her executive and managerial positions with the Company, directly participated in the daily management of the Company, and was directly involved in the day-to-day operations of the Company at the highest level, and was privy to confidential proprietary information concerning the Company and its business and operations, and revenue recognition policies. The Individual Defendants were involved or participated in drafting, producing, reviewing and/or disseminating the false and misleading statements alleged [in the Complaint].

They further assert that the individual defendants "had a duty to promptly disseminate truthful and accurate information with respect to Alpharma and to promptly correct any public statements

issued by or on behalf of the Company that had become false or misleading." Plaintiffs allege this duty was violated when defendants knowingly or recklessly disregarded the fact that "the misleading statements and omissions would adversely affect the integrity of the market for the Company's stock and would cause the price of the Company's common stock to become artificially inflated."

## D. Details of AHD's Pre-Sales

Alpharma's AHD conducts business with its customers through a staff of sales representatives. At all times relevant to the Complaint, these sales representatives were supervised by regional sales managers. The sales managers reported to Randy Maclin, AHD's vice president of sales and marketing within the United States, and Loren Williams, vice president of sales and marketing for AHD in Latin America. In a typical transaction, sales representatives would provide the company's Customer Service Department (CSD) with the details of the purchase, including whether the product was to be shipped, picked up, or placed on "customer hold." The CSD would then enter the transaction into the company's Business Planning and Control System (BPCS), which allocated inventory for the sale and created an invoice. Each warehouse would conduct a monthly inventory, the results of which were submitted to Alpharma's headquarters in New Jersey. However, the Brazil division of AHD did not use the BPCS. Instead, it recorded sales by sending copies of sales

reports and financial statements directly to Alpharma's New Jersey headquarters, which then entered the data into the BPCS. Further, Michael Weaver, AHD's vice president of finance and one of Andrews' subordinates, made monthly trips to Brazil to review sales records and audit inventory. Based on these facts, plaintiffs allege that personnel in Alpharma's New Jersey headquarters were "aware of or should have been aware of and able to access sales results from its Brazilian operations."

Beginning when he became president of the AHD in May 1997, Andrews is alleged to have engaged in a number of questionable practices, including (1) telling AHD staff that he would take whatever action was necessary to raise Alpharma's stock price, (2) firing AHD sales representatives and managers and replacing them with former co-workers from his prior employer, and (3) no longer seeking input from sales representatives as to appropriate yearly sales quotas. This last action was relevant, as year-end bonuses were tied to the staff's ability to meet the sales goals set by Andrews. Plaintiffs allege that these purportedly unrealistic sales targets caused employees to engage in questionable activities such as the pre-sales described above. Because the number of products on customer hold could be determined from an examination of BPCS entries, plaintiffs conclude that examination of such entries "did or could have alerted [defendants] to the fact that [AHD] was inflating its results by, essentially, shipping to itself."

5

The Complaint goes on to detail a number of setbacks and expensive acquisitions which purportedly weighed on the company and pressured executives to increase revenue in AHD. Plaintiffs allege that, as a result of these difficulties, the use of pre-sales spread beyond AHD. Specifically, they assert that Knut Moksnes and Laritz Valderhaug, the president and senior controller of the Aquatic Animal Health Division (AAHD), asked AAHD controllers to record unreceived cash as accounts receivable despite the fact that the products in question had not yet been shipped to the customer. This resulted in the resignation of one AAHD controller, who cited her concerns during an exit interview, which, she believes, was documented and placed in her personnel file at Alpharma's New Jersey headquarters. The Complaint further alleges that Loren Williams, who served until October 2000 as AHD's vice president of sales and marketing for Latin America, resigned over similar disagreements with management but that Williams is unable to assist plaintiffs' counsel due to a non-disclosure agreement.

### E. Statements Made During the Class Period

#### (1) First Quarter of 1999

The class period began on April 28, 1999, when Alpharma announced results for the first quarter of 1999. The company issued a press release which highlighted the marked improvement in revenues, net income, and earnings per share compared to the first quarter of 1998. Because a report issued by a Wall Street analyst following the announcement of first quarter results mentioned increased sales in Latin America and Southeast Asia, plaintiffs allege that defendants "were aware that the market was attributing Alpharma's apparent success to international operations, including specifically Latin America."

The company filed its Form 10-Q for the first quarter of 1999 with the Securities and Exchange Commission (SEC) on May 12, 1999.[4] This form, signed by vice president and CFO Smith on behalf of himself and the company, contained the same inflated numbers as the April 28 press release. These numbers were revenue of $156,759,000, net income of $7,436,000, and earnings per share of twenty-seven cents. In its October 30, 2000, restatement, Alpharma lowered revenue by $810,000, net income by $238,000, and earnings per share by one cent.

#### (2) Second Quarter of 1999

---

[4]Each of the 10-Q Forms filed by Alpharma contained a notes section which stated, in part, that "[t]he accompanying consolidated condensed financial statements include all adjustments (consisting only of normal recurring accruals) which are, in the opinion of management, considered necessary for a fair presentation of the results for the periods presented."

6

Alpharma announced results for the second quarter of 1999 on July 28, 1999. Comparing results to the second quarter of 1998, the accompanying press release highlighted increases in revenue, net income, and earnings per share. The earnings per share number exceeded Wall Street's consensus estimate by one cent, thereby continuing Alpharma's streak of ten consecutive quarters of exceeding analysts' expectations. The value of the company's stock increased by approximately twelve percent following the issuance of second quarter results.

The company filed its Form 10-Q for the second quarter of 1999 with the SEC on August 9, 1999. This form, signed by Smith on behalf of himself and the company, contained the same inflated numbers as the July 28 press release. These numbers were revenue of $163,839,000, net income of $7,772,000, and earnings per share of twenty-eight cents. In the October 30, 2000, restatement, Alpharma lowered revenue by $1,622,000, net income by $404,000, and earnings per share by two cents. The consensus estimate for the second quarter of 1999 had called for earnings per share of twenty-seven cents. Thus, Alpharma would have missed this estimate by one cent had its results been reported correctly in the first instance.

*(3) Third Quarter of 1999*

Alpharma announced its third quarter results on October 25, 1999. Comparing results to the third quarter of 1998, the accompanying press release highlighted increases in revenue, net income, and earnings per share. The earnings per share number exceeded Wall Street's consensus estimate by two cents, extending Alpharma's streak of consensus-beating quarters to eleven. The value of the company's stock increased by approximately thirteen percent following the issuance of third quarter results.

The company filed its Form 10-Q for the third quarter of 1999 with the SEC on November 2, 1999. This form, signed by Smith on behalf of himself and the company, contained the same inflated numbers as the October 25 press release. These numbers were revenue of $203,131,000, net income of $11,263,000, and earnings per share of thirty-eight cents. In its October 30, 2000 restatement, Alpharma lowered revenue by $3,302,000, net income by $890,000, and earnings per share by three cents. As with the second quarter, Alpharma would have missed analysts' earnings estimates absent the overstatement of revenue.

*(4) Fourth Quarter and Full Year 1999*

The company's fourth quarter and full year results for 1999 were issued on February 23, 2000. The accompanying press release highlighted both quarterly and yearly growth in revenue, net income, and earnings per share. The earnings per share number exceeded expectations for the twelfth consecutive quarter. Highlighting this fact, Sissener issued the following statement:

Alpharma has now achieved

*12 consecutive quarters of growth above the goals we have set*. I am pleased with these exceptional results, which I believe reflect the success of the focused growth strategies we have established and of the efforts of our employees all around the world. The record results are particularly gratifying because they were achieved as we continued to make and successfully absorb significant strategic acquisitions that are an integral part of our long-term growth strategy.

Similarly, Wiik stated that "[c]learly, Alpharma's established strategies for growth are working. By continuing to execute, we look for this profitable growth to continue in 2000 and beyond."

The company filed its Form 10-K for the fourth quarter and full year 1999 with the SEC on March 29, 2000. This form, signed by Smith, Sissener, and Wiik on behalf of themselves and the company, contained the same inflated numbers as the February 23 press release. The fourth quarter numbers were revenue of $218,447,000, net income of $13,080,000, and earnings per share of forty-one cents. In its October 30, 2000, restatement, Alpharma lowered fourth quarter revenue by $3,999,000, net income by $1,047,000, and earnings per share by three cents. The full year numbers for 1999 were similarly lowered following restatement. Revenue of $742,176,000, net income of $39,551,000, and earnings per share of $1.34 were decreased by $9,733,000, $2,579,000, and nine cents, respectively. The 10-K for 1999 further stated "that 'revenue is recognized upon shipment of products to customers.'"

### (5) First Quarter of 2000

Alpharma announced results for the first quarter of 2000 on April 26, 2000. As before, the company highlighted increases in revenue, net income, and earnings per share compared to the first quarter of 1999. In connection with this announcement, Wiik stated that "[t]hese record first quarter results reflect the continued successful implementation of our growth strategies to build the global Alpharma enterprise. We are experiencing strong top line growth due to both new product introductions and complimentary acquisitions . . . we expect continued strong revenue growth throughout 2000." The earnings per share number exceeded Wall Street's consensus estimate by two cents, extending Alpharma's streak of consensus-beating quarters to thirteen. Between April 25 and May 1, the value of Alpharma's stock increased by nine

percent.

The company filed its Form 10-Q for the first quarter of 2000 with the SEC on May 8, 2000. This form, signed by Smith on behalf of himself and the company, contained the same inflated numbers as the April 26 press release. These numbers were revenue of $118,280,000, net income of $11,114,000, and earnings per share of thirty-five cents. Following restatement, revenue was lowered by $2,202,000, net income by $749,000, and earnings per share by two cents. As in previous quarters, Alpharma would have missed analysts' earnings estimates absent the overstatement of revenue.

### (6) Second Quarter of 2000

Alpharma announced its results for the second quarter of 2000 on July 31, 2000. As before, the company highlighted increases in revenue, net income, and earnings per share compared to the second quarter of 1999. On August 1, the value of Alpharma's stock rose ten percent to $71.94, the highest close reached at any time during the class period.

### F. The Discovery of the Accounting Irregularities

Plaintiffs assert that the internal investigation of the accounting irregularities described by Alpharma would have taken a significant amount of time to complete and that the company must therefore have been aware of the accounting irregularities occurring in Brazil long before the public announcement on October 30. They further claim that employees in the company's New Jersey headquarters were notified of incidents of improper accounting by Paulo Andreoli, a technical sales manager in AHD's Brazil division. Andreoli allegedly was told that there would be no investigation into his allegations. However, plaintiffs contend that the information submitted by Andreoli "was reviewed or available for review by all Defendants, and in particular, defendant Andrews, president of [AHD]." As an example of the activities occurring at Alpharma, plaintiffs allege that the Brazil division's December 1999 sales report contained nineteen fraudulent sales, eighteen of which occurred three days before the end of the quarter and reflected sales activity that was "grossly out of line with the sales made during the rest of the month."

Quoting 17 C.F.R. § 229.303(a)(1)-3(3) and Instruction 3, plaintiffs further allege that defendants had a duty under applicable SEC regulations to "disclose in periodic reports filed with the SEC 'known trends or any known demands, commitments, events or uncertainties' that are reasonably likely to have a material impact on a company's sales revenues, income or liquidity, or cause previously reported financial information not to be indicative of future operating results." Additionally, plaintiffs assert that defendants had "a duty 'to make full and prompt announcements of material facts regarding the company's financial

9

condition.'"[5] They allege that these duties were violated by defendants' issuance of financial results that violated both GAAP and Alpharma's own revenue recognition policy. As noted by the District Court, this section of the Complaint is followed by additional allegations of scienter which add nothing of substance to the claims described above.

## *H. Plaintiffs' Rule 10b-5 and Section 20(a) Claims*

The above-described allegations lay the groundwork for the two counts asserted in

the Complaint. Count I is brought against all defendants pursuant to Rule 10b-5. In broad terms, it asserts that defendants acted both individually and collectively to defraud investors by making materially false or misleading statements in connection with the sale of the company's stock. Count II alleges that the individual defendants were "controlling persons" of Alpharma, and thus violated Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78, et seq. (the "Exchange Act"), by causing the Section 10(b) violation described in Count I.

## II. Procedural History

As noted above, the Complaint was filed on June 8, 2001, following consolidation of the six initial proposed class actions pending against Alpharma.

On May 20, 2002, the District Court, concluding that plaintiffs failed to state a claim under either Rule 10b-5 or Section 20(a), dismissed the Complaint with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiffs' motion for reconsideration was denied by the District Court on August 12, 2002, and this appeal followed.

## III. Jurisdiction and Standard of Review

Plaintiffs filed this proposed class action pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a). As such, the District Court exercised jurisdiction over this case pursuant to 28 U.S.C. § 1331. We have jurisdiction to review the final judgment of the District Court pursuant to 28 U.S.C. § 1291.

Our review of the District Court's dismissal of the Complaint pursuant to Rule 12(b)(6) is plenary. Brown v. Philip Morris, Inc., 250 F.3d 789, 796 (3d Cir. 2001). As the District Court did, "[w]e must accept as true all of the factual allegations in the complaint as well as the reasonable inferences that can be drawn from them," and "may dismiss the complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Id. We similarly exercise plenary review over the District Court's interpretation of the applicable federal securities laws. In re Rockefeller Center Properties, Inc. Sec. Litig., 311 F.3d 198, 215 (3d Cir. 2002). However, we review

---

[5] Quoting SEC Release No. 34-8995, 3 Fed. Sec. L. Rep. (CCH) ¶ 23,120A, at 17,095, 17 C.F.R. § 241.8995 (October 15, 1970).

10

the District Court's denial of plaintiffs' alternative request for leave to amend the Complaint for abuse of discretion. See In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1323 (3d Cir. 2002); In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997).

## IV. Discussion

Plaintiffs' argument is straightforward. They contend that the District Court erred in dismissing the Complaint for failure to state a claim upon which relief may be granted and, in the alternative, that the court abused its discretion in failing to grant them leave to amend. We begin our analysis with an overview of the relevant pleading requirements and then address in turn each of plaintiffs' assignments of error.

### A. Overview

The gravamen of the Complaint is the Rule 10b-5 claim asserted against all defendants in Count I.[6] Thus, we begin by noting that "Section 10(b) prohibits the 'use or employ, in connection with the purchase or sale of any security, . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . ..'" In re Ikon Office

---

[6]As discussed in greater detail below, the viability of Count II, which alleges controlling person liability pursuant to Section 20(a) of the Exchange Act against the individual defendants, is contingent upon the success of Count I.

Solutions, Inc., 277 F.3d 658, 666 (3d Cir. 2002) (quoting 15 U.S.C. § 78j(b)). Section 10(b) is enforced through Rule 10b-5, which creates a private cause of action for investors harmed by materially false or misleading statements. In re Advanta Corp. Sec. Litig., 180 F.3d 525, 535 (3d Cir. 1999). Specifically, Rule 10b-5 "makes it unlawful for any person '[t]o make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made in light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security.'" In re Ikon, 277 F.3d at 666 (quoting 17 C.F.R. § 240.10b-5(b)).

In order to state a claim pursuant to Rule 10b-5, plaintiffs must allege that defendants "(1) made a misstatement or an omission of a material fact (2) with scienter (3) in connection with the purchase or the sale of a security (4) upon which [plaintiffs] reasonably relied and (5) that [plaintiffs'] reliance was the proximate cause of [their] injury." Id. In so doing, the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4 et seq., requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-

4(b)(1)(B).[7] Of particular significance here, the PSLRA also requires that the applicable mental state be pled with particularity. In re Advanta, 180 F.3d at 530. Specifically, it states, in relevant part, as follows:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(2). "The requisite

[7]The purpose of the heightened pleading requirements contained in the PSLRA is "to restrict abuses in securities class-action litigation, including: (1) the practice of filing lawsuits against issuers of securities in response to any significant change in stock price, regardless of defendants' culpability; (2) targeting of 'deep pocket' defendants; (3) the abuse of the discovery process to coerce settlement; and (4) manipulation of clients by class action attorneys." In re Advanta, 180 F.3d at 531 (citing H.R. Conf. Rep. No. 104-369, at 28 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 748).

'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." In re Burlington Coat Factory, 114 F.4d at 1418. The appropriate sanction for complaints which fail to meet these requirements is dismissal. In re Advanta, 180 F.3d at 531 (citing 15 U.S.C. § 78u-4(b)(3)(A)).

In addition to the requirements contained in the PSLRA, Plaintiffs also must comply with those set forth in Federal Rule of Civil Procedure 9(b). Id. Rule 9(b) provides, in relevant part, that plaintiffs alleging fraud must state "the circumstances constituting fraud or mistake . . . with particularity." Fed. R. Civ. P. 9(b). However, plaintiffs may generally allege "[m]alice, intent, knowledge, and other condition of mind of a person." Id. As applied to Rule 10b-5 claims, "Rule 9(b) requires a plaintiff to plead (1) a specific false representation [or omission] of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage." In re Rockefeller Center Properties, 311 F.3d at 216 (citation and internal quotations omitted); GSC Partners CDO Fund v. Washington, __ F.3d __ [14](3d Cir. 2004). Further, "Rule 9(b) requires plaintiffs to identify the source of the allegedly fraudulent misrepresentation or omission."

Id. In sum, "Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of securities fraud with all of the essential factual background that would accompany 'the first paragraph of any newspaper story' — that is, the 'who, what, when, where and how' of the events at issue." Id. at 217 (quoting In re Burlington Coat Factory, 114 F.3d at 1422); GSC Partners at [20]. Importantly, to the extent that Rule 9(b)'s allowance of general pleading with respect to mental state conflicts with the PSLRA's requirement that plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2), the PSLRA "supersedes Rule 9(b) as it relates to Rule 10b-5 actions." In re Advanta, 180 F.3d at 531 n.5.

Here, the primary basis for the District Court's dismissal of the Complaint was plaintiffs' failure to adequately plead the essential element of scienter. We have previously defined "scienter" in the context of securities fraud as "a mental state embracing intent to deceive, manipulate or defraud, or, at a minimum, highly unreasonable (conduct), involving not merely simple, or even excusable negligence, but an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." In re Ikon, 277 F.3d at 667 (citations and internal quotations omitted). In order to properly plead scienter under the PSLRA, plaintiffs

must "alleg[e] facts 'establishing a motive and an opportunity to commit fraud, or . . . set[] forth facts that constitute circumstantial evidence of either reckless or conscious behavior.'" In re Advanta, 180 F.3d at 534-35 (quoting Weiner v. Quaker Oats Co., 129 F.3d 310, 318 n.8 (3d Cir. 1997)); In re Digital Island Securities Litigation, 357 F.3d 322, 328-29 (3d Cir. 2004). In so doing, plaintiffs "must allege facts that could give rise to a 'strong' inference of scienter"; general allegations that defendants knew or recklessly disregarded the false nature of the statements at issue are insufficient. In re Burlington Coat Factory, 114 F.3d at 1422.

Plaintiffs pleading scienter through motive and opportunity must support their allegations with "facts stated 'with particularity'" that "give rise to a 'strong inference' of scienter." In re Advanta, 180 F.3d at 535 (quoting 15 U.S.C. § 78u-4(b)(2)). Thus, under the PSLRA, "catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are no longer sufficient, because they do not state facts with particularity or give rise to a strong inference of scienter." Id.; GSC Partners, F3d at [15-16]. Plaintiffs attempting to satisfy their burden of pleading scienter by alleging facts establishing recklessness must allege a statement "involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is

either known to the defendant or is so obvious that the actor must have been aware of it." In re Advanta, 180 F.3d at 535 (citation and internal quotations omitted). It is against this backdrop that we examine the Complaint at issue here.

## B. Dismissal of the Complaint

### (1) Plaintiffs' Rule 10b-5 Claim

As noted above, the District Court held that plaintiffs failed to adequately plead the essential element of scienter, and thus failed to state a claim under the federal securities laws. In particular, the court concluded that the allegations contained in the Complaint failed to satisfy the strict pleading requirements of Rule 9(b) and the PSLRA. In reaching this conclusion, the District Court noted that the Complaint merely imputes scienter to the individual defendants as a result of their positions within the company, and thus fails to establish that either they or, by extension, the corporation were involved with the accounting irregularities occurring in AHD's Brazil division.

On appeal, plaintiffs assert that the Complaint adequately pleads scienter by alleging both recklessness and motive. More specifically, they contend they have demonstrated recklessness by alleging that (1) defendants violated GAAP as well as Alpharma's internal revenue recognition policy, and (2) that "whistleblowers" within AHD's Brazil division reported the use of pre-sales and questionable accounting practices to Alpharma's New Jersey headquarters where it could be accessed by the individual defendants.

They argue that motive and opportunity are established by their allegations regarding the defendants' sale of stock during the class period.

We disagree. Turning first to the issue of recklessness, we concur with the District Court's conclusion that, at bottom, plaintiffs' allegations rest primarily upon the premise that the individual defendants are liable simply by virtue of the positions they hold within the company. We recently rejected similar allegations in In re Advanta, holding that "[g]eneralized imputations of knowledge" do not satisfy the scienter requirement "regardless of the defendants' positions within the company." 180 F.3d at 539. Rather, plaintiffs must allege "an extreme departure from the standards of ordinary care," in order to establish recklessness. Id. at 535. As explained below, they fail to do so here with respect to any of the four individual defendants.

The Complaint fails to allege that Sissener, Wiik, or Smith were involved in any way with the violations of GAAP and Alpharma's revenue recognition policy occurring in Brazil. The allegations against Andrews similarly fail. As defendants note, the Complaint fails to identify any pre-sales made pursuant to Andrews' instruction. Rather, plaintiffs simply allege that Andrews set "lofty" quarterly sales goals and then pressured sales representatives to meet them.[8] We

---

[8]Paragraphs 53 and 55 of the Complaint allege the following:

hold that such conclusory allegations are insufficient to state a claim under the applicable pleading requirements. See In re Burlington Coat Factory, 114 F.3d at 1418 (holding that "even under a relaxed application of Rule 9(b), boilerplate and conclusory allegations will not suffice";

> [I]n order to move volumes of products necessary to meet the lofty quarter-end numbers set by defendant Andrews, sales representatives were instructed to offer customers incentives and special sales terms in order to get the customers to buy product they already had in stock. To this end, sales representatives were instructed to extend the payment and shipping period from 30 days to as much as 180 days.

\* \* \*

> [I]n response to defendant Andrews' directive, sales invoices were issued and sales were immediately recorded on Alpharma's books and identified as accounts receivable, even if the product was not paid for and shipped out to the customer for several months.

rather, "Plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible") (emphasis deleted); see also Kushner v. Beverly Enterprises, Inc., 317 F.3d 820, 827-28 (8th Cir. 2003) (holding that allegations that defendants "designed and implemented" improper accounting policies failed to state a claim for securities fraud in the absence of "allegations of particular facts demonstrating how the defendants knew of the scheme at the time they made their statements of compliance, that they knew the financial statements overrepresented the company's true earnings, or that they were aware of a GAAP violation and disregarded it . . .. Rote allegations that the defendants knowingly made false statements of material fact fail to satisfy the heightened pleading standard of the Reform Act.") (citation and internal quotations omitted). Further, allegations that Williams, Andrews' subordinate, knew of the irregularities occurring in Brazil provide an insufficient basis upon which to impute knowledge to Andrews. See Kushner, 317 F.3d at 828 (holding that an allegation that someone involved in the relevant scheme reported to one of the named defendants was "not specific enough to support a strong inference that [the defendant] knew of or participated in the fraudulent practice while it was occurring").

Indeed, "[w]hile under Rule 12(b)(6) all inferences must be drawn in plaintiffs' favor, inferences of scienter do not survive if they are merely reasonable .

15

. . . Rather, inferences of scienter survive a motion to dismiss only if they are both reasonable and 'strong' inferences." In re Navarre Corp. Sec. Litig., 299 F.3d 735, 741 (8th Cir. 2002) (citation and internal quotations omitted). Such clearly cannot be said here. Thus, the District Court correctly concluded that the Complaint fails to "link Alpharma's executives or any of the named Individual Defendants to the Brazil incidents."

Plaintiffs' so-called "whistleblower" allegations — which assert that Alpharma's New Jersey headquarters was alerted to the violation of the company's revenue recognition policy by employees within AHD's Brazil division and that the individual defendants therefore had access to this information — fare little better. As defendants note, the Complaint simply alleges that a sales manager in AHD's Brazil division notified employees in New Jersey of the accounting irregularities in Brazil. There was no investigation of these allegations, nor does the Complaint allege that the allegations of improper accounting were ever passed up the chain of command to Sissener, Wiik, or Smith. In addition, plaintiffs' allegation that Andrews knew of this information is wholly conclusory and thus cannot survive a motion to dismiss. See In re Burlington Coat Factory, 114 F.3d at 1418. Moreover, the mere fact that the information was sent to Alpharma's headquarters and therefore was available for review by the individual defendants is insufficient to "giv[e] rise to a strong inference that [defendants] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Looked at as a whole, plaintiffs' allegations rest on nothing more than a "series of inferences . . . too tenuous to amount to one of those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care." Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1210 (11th Cir. 2001).

Moreover, we note that the Complaint is devoid of any allegations which would establish that AHD's Brazil division was so central to Alpharma's business that its increased revenue figures should have received particular attention from company executives. Indeed, the Brazil division's total revenue accounted for only slightly more than one half of one percent of the company's total revenue in 1999. In view of this, it strains credulity to assert that company executives must have known that a spike in the Brazil division's sales was the result of violations of GAAP and of the company's revenue recognition policies rather than a normal increase in business. See In re Advanta, 180 F.3d at 539 (noting that "[i]t is well established that a pleading of scienter may not rest on a bare inference that a defendant must have had knowledge of the facts.") (citation and internal quotations omitted); see also Kushner, 317 F.3d at 829 (noting that "'the failure of a parent company to interpret extraordinarily positive performance by its subsidiary . . . as a sign of problems and thus to investigate further

does not amount to recklessness under the securities laws'") (quoting Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000)); Chill v. General Elec. Co., 101 F.3d 263, 270 (2d Cir. 1996) (holding that, "[g]iven the significant burden on the plaintiff in stating a fraud claim based on recklessness, the success, even the extraordinary success, of a subsidiary will not suffice in itself to state a claim that the parent was reckless in failing to further investigate. Fraud cannot be inferred simply because [the parent corporation] might have been more curious or concerned about the activity at [its subsidiary]."); In re Comshare, Inc. Sec. Litig., 183 F.3d 542, 554 (6th Cir. 1999) (citing Chill for the proposition that courts "should not presume recklessness or intentional misconduct from a parent corporation's reliance on it subsidiary's internal controls"). At worst, the Complaint alleges little more than mismanagement. As we have previously held, such claims "are not cognizable under federal law." In re Advanta, 180 F.3d at 540 (citations and internal quotations omitted); In re Digital Island, 357 F.3d at 332.

Thus, we conclude that plaintiffs' allegations as stated that (1) defendants violated GAAP and Alpharma's revenue recognition policy, and (2) that employees within the Brazil division reported these violations to the company's headquarters in New Jersey do not amount to "an extreme departure from the standards of ordinary care," In re Advanta, 180 F.3d at 535, and therefore fail to state Rule 10b-5

claims premised on recklessness.

We turn next to plaintiffs' allegations as to motive and opportunity. To summarize, plaintiffs assert that the existence of scienter is established by the fact that (1) both the company and three of the four individual defendants sold shares of common stock at inflated prices during the class period, and (2) that all defendants thus benefitted from the alleged fraud at the expense of investors. The District Court rejected these allegations, noting that (1) Sissener, Alpharma's largest shareholder, and thus the one who stood gain the most from the alleged fraud, sold no stock during the class period and therefore failed to benefit from the fraudulent scheme of which he is alleged to have been a major participant; and (2) the Complaint fails to allege how much stock the individual defendants received as a portion of their regular compensation.

Having carefully reviewed the Complaint we similarly reject plaintiffs' arguments. In so doing, we note, as the District Court did, that "'[a] large number of today's corporate executives are compensated in terms of stock and stock options.'" In re Advanta, 180 F.3d at 541 (quoting In re Burlington Coat Factory, 114 F.3d at 1424). Thus, "'[i]t follows . . . that these individuals will trade those securities in the normal course of events.'" Id. Although we have recognized that an inference of scienter may be created when plaintiffs demonstrate that sales are "unusual in scope or timing," id. at 540, we concluded that the plaintiffs in both In re Burlington Coat Factory and In re

17

Advanta failed to establish such an inference based in part on the fact that some key insiders sold no stock during the class period. See In re Burlington Coat Factory, 114 F.3d at 1423; In re Advanta, 180 F.3d at 540-41.

Here, in addition to the fact that the company's controlling shareholder did not engage in any sales during the class period, we note that the Complaint fails to allege that the sales of the remaining three individual defendants were unusual in scope (e.g., compared to their total level of compensation or the size of previous sales) or timing (e.g., compared to the timing of past trades).[9] The allegations therefore fail to give rise to a strong inference of scienter. Thus, we will affirm the District Court's refusal to impute knowledge of the false accounting practices to the individual defendants based solely upon their stock sales.

We reach a similar conclusion with respect to the motive allegations leveled against the company, which, as defendants note, could be made against virtually any for-profit entity. See In re K-Tel Int'l, Inc. Sec. Litig., 300 F.3d 881, 895 (8th Cir. 2002) (holding that "general allegations of a desire to increase stock prices, increase officer compensation or maintain continued employment are too generalized and are insufficient" to establish scienter); Chill, 101 F.3d at 268 (holding that general motives that can "be imputed to any publicly-owned, for-profit endeavor, [are] not sufficiently concrete for purposes of inferring scienter"); see also In re The Vantive Corp. Sec. Litig., 283 F.3d 1079, 1097 (9th Cir. 2002) (concluding that a corporation's desire to increase its stock value as part of an acquisition strategy is an insufficient basis upon which to maintain a claim for violation of federal securities laws); In re Nice Systems, Ltd. Sec. Litig., 135 F. Supp.2d 551, 583-84 (D.N.J. 2001) (same); In re Cendant Corp. Sec. Litig., 76 F. Supp.2d 539, 548 (D.N.J. 1999) (same) (citing Chill, 101 F.3d at 267). Thus, we conclude that plaintiffs

---

[9]Even plaintiffs' assertion that these defendants had not sold any stock during the preceding fifteen months, standing alone, is insufficient. Defendants assert that they were precluded from doing so as a result of a "blackout period" during which insiders were prohibited from engaging in such transactions. While we cannot credit defendants' explanations at this stage of the litigation, we note their argument that the existence of such a blackout period may be inferred from the Complaint, which alleges a series of corporate acquisitions during the class period. Because the individual defendants are alleged to have known about these acquisitions, and thus possessed material non-public information, they would have been prohibited by law from trading during much of the class period. Moreover, plaintiffs failed to allege the absence of a blackout period or other facts which would demonstrate that the fifteen month period of inactivity was in any way unusual.

18

have similarly failed to allege facts giving rise to a strong inference of scienter as to the corporation. We therefore will affirm the District Court's dismissal of Count I for failure to state a claim.

### *(ii) Plaintiffs' Section 20(a) Claim*

As we have previously noted, "Section 20(a) imposes joint and several liability on any person who 'controls a person liable under any provision of' the [Exchange Act]." Shapiro v. UJB Financial Corp., 964 F.2d 272, 279 (3d Cir. 1992). Accordingly, under the plain language of the statute, plaintiffs must "prove not only that one person controlled another person, but also that the 'controlled person' is liable under the Act. If no controlled person is liable, there can be no controlling person liability." Id. Here, the alleged "controlled person" is Alpharma. Thus, because plaintiffs failed to state a Rule 10b-5 claim against the company, its Section 20(a) claim against the Individual Defendants fails as well. See Shapiro, 964 F.2d at 279; In re Digital Island, 357 F.3d at 337. Thus, we also will affirm the District Court's dismissal of Count II for failure to state a claim.

### C. Denial of Leave to Amend

Having concluded that the District Court properly granted defendants' motion to dismiss as to both counts, we must now determine whether the court abused its discretion by failing to grant plaintiffs leave to amend the Complaint. Although Federal Rule of Civil Procedure 15 states that leave to amend "shall be freely given when justice so requires," we have held

that "a District Court may deny leave to amend on the grounds that amendment would cause undue delay or prejudice, or that amendment would be futile." Oran v. Stafford, 226 F.3d 275, 291 (3d Cir. 2000); In re Digital Island, 357 F.3d at 337; GSC Partners, F.3d at [34].

Here, the District Court cited futility, the "significant extensions of time" already provided to plaintiffs, and the aim of the PSLRA to filter out weak claims at the early stages of litigation as the bases for its denial of leave to amend and dismissal of the Complaint with prejudice. Focusing in particular on futility, the District Court noted that plaintiffs failed to proffer any proposed amendment, let alone one that would satisfy the stringent pleading requirements which govern Rule 10b-5 claims.

Following careful review of the record, we conclude that this was not an abuse of discretion. As we have previously held, "'[f]utility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted." In re Burlington Coat Factory, 114 F.3d at 1434. Thus, "[i]n assessing 'futility,' the district court applies the same standard of legal sufficiency as applies under Rule 12(b)(6)." Id.

Had plaintiffs satisfied the requirements of the PSLRA and merely failed to allege facts with sufficient particularity under Federal Rule of Civil Procedure 9(b) we would be presented with a closer issue. See id. at 1435. However, because plaintiffs (1) failed to

satisfy the stringent pleading requirements of the PSLRA, and thus failed to state a claim under federal securities law, and (2) failed to propose an amendment that would satisfy these requirements, we agree that leave to amend would be futile. Moreover, we note, as the District Court did, that its denial of leave to amend is further supported by the fact that plaintiffs (1) had already filed previous complaints and (2) were given an extension of time to assemble the amended consolidated complaint currently at issue. See id. Thus, we will affirm the District Court's denial of leave to amend and dismissal of the Complaint with prejudice.

## V. Conclusion

For the reasons stated above, we will affirm the final judgment of the District Court.