

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-6-2007

# Key Equity Inv Inc v. Sel Lab Marketing

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-1052

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Key Equity Inv Inc v. Sel Lab Marketing" (2007). *2007 Decisions*. Paper 474.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/474

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 06-1052

———

KEY EQUITY INVESTORS INC.,

Appellant

v.

SEL-LEB MARKETING INC.; HAL MARKOWITZ; JACK KOEGEL;
PAUL SHARP; GEORGE FISCHER; JH COHN LLP,

———

On Appeal from the United States District Court
for the District of New Jersey
(04-cv-01675)
District Judge: Honorable Dennis M. Cavanaugh

———

Submitted pursuant to Third Circuit LAR 34.1(a)
June 28, 2007

Before: BARRY, FUENTES and GARTH, Circuit Judges.

(Filed:  September 6, 2007)

———

OPINION OF THE COURT

—————

FUENTES, Circuit Judge.

In this securities appeal, we review the District Court's decision to dismiss the complaint of Key Equity Investors, Inc. ("Key Equity") for failure to satisfy the pleading requirements of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 et seq. ("PSLRA"). Appellant, Key Equity, alleged that defendants issued materially false and misleading statements about the financial health of a company called Sel-Leb Marketing, Inc. ("Sel-Leb"). For the reasons that follow, we will affirm.

## I. Factual and Procedural Background

A.      Factual Background[1]

Sel-Leb is a New York corporation that distributes and markets consumer merchandise to retailers. At all relevant times, Harold Markowitz, Paul Sharp, Jack Koegel, and George Fischer were company directors, and J.H. Cohn, LLP was a company auditor. In the period between April 5, 2002 and February 25, 2004 (the putative class period), during which Key Equity purchased company stock, Sel-Leb made numerous statements relevant to this appeal.

_____

[1] On review of a motion to dismiss, we "accept all well-pled allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party." Brown v. Card Service Center, 464 F.3d 450, 452 (3d Cir. 2006). Our review is limited to the contents of the complaint and any attached exhibits. Yarris v. County of Delaware, 465 F.3d 129, 134 (3d Cir. 2006).

Two of the statements concerned the past financial performance of the company. First, on April 5, 2002, Sel-Leb filed a form with the Securities and Exchange Commission ("SEC") reporting a net income of $443,669 for fiscal year 2001. In the disclosure, J.H. Cohn stated that it audited the company's financial statements and that they conformed with generally accepted accounting principles ("GAAP"). Second, Sel-Leb issued a press release on August 15, 2002 announcing $418,370 in pre-tax earnings for the first six months of 2002.

In contrast to these statements of prior earnings, many of Sel-Leb's other statements expressed its "glowingly optimistic expectations for fiscal year 2002." (A50) For instance, in April 2002, the company said it was "slated to begin to generate strong revenue and earnings growth in 2002." (A51 (internal quotation marks omitted)) In May, the company "anticipate[d] . . . report[ing] record revenues for its fiscal year end[ing] December 31, 2002." (A51) In August and September, it reiterated its optimism about 2002. And in November, although recognizing the financial difficulties of "several of our major customers," Sel-Leb predicted "a significant increase in the sales and earnings" for the fourth quarter of 2002. (A52) Notably, in November the company also stated that it had renegotiated and renewed the terms of a $3.8 million "credit facility" with Merrill Lynch Business Financial Services, Inc. ("Merrill Lynch"). (A53)

In late 2002, Sel-Leb's expectations about its financial health "began to dim." (A53) On December 24, 2002, it issued a press release indicating that "sales for the fourth quarter of 2002 will be substantially lower than the revised projection previously

-3-

issued by the Company." (A53) The company cited "generally weak economic conditions," and "production problems" with a third-party manufacturer that had "caused the Company to miss shipping orders during the fourth quarter." (A53) Moreover, throughout early 2003, the company was unable to make required financial disclosures "due to unforeseen difficulties in obtaining information essential to these estimates." (A54) Specifically, Sel-Leb had been unable to obtain information "from an independent third party, which is an integral and important part of the Company's operations." (A54) As a result, Sel-Leb announced that it would be "delisted from the Nasdaq SmallCap Market with the opening of business on Friday, May 23, 2003." (A54)

Sel-Leb later disclosed, on July 24, 2003, that it was "not in compliance with certain net worth and cash flow covenants of its Merrill Lynch credit facility," and on October 15, 2003, revealed that the credit facility had been terminated. (A54) On February 24, 2004, the company indicated that its operations had been significantly curtailed due to decreased sales and lack of funding. Finally, it stated that it had incurred a pre-tax loss of $3.8 million for fiscal year 2002, and also had to revise downward by $1.8 million its pre-tax income for fiscal year 2001.

According to the complaint, although Sel-Leb's stock had traded as high as $4.00 per share, its disclosures about financial health had rendered the company's shares worthless.[2]

---

[2] We may take judicial notice under Federal Rule of Evidence 201 of facts not found by the district court, even when reviewing its ruling on a motion to dismiss.

B. District Court Opinion

On April 9, 2004, Key Equity filed a class action complaint in the United States District Court for the District of New Jersey. Based on the foregoing facts, Key Equity alleged that Sel-Leb, and its directors and accountant, (collectively, "defendants") had made materially false and misleading statements in violation of section 10(b) of the Securities Exchange Act of 1934.[3] In particular, Key Equity alleged that Sel-Leb had "failed to disclose" that: (1) pre-tax earnings for fiscal year 2001 were overstated by approximately $1.8 million; (2) the company incurred a pre-tax loss of approximately $3.8 million for fiscal year 2002; (3) the company was in default on the terms of its credit facility with Merrill Lynch; and (4) the company's financial statements were not prepared in accordance with GAAP.

According to the complaint, defendants concealed information about the "true state of the Company's deteriorating affairs" in order to "maintain the credit facility with Merrill Lynch." (A57) In Key Equity's view, "[h]ad Merrill Lynch discovered the adverse information about the Company earlier, it would have called for termination of the credit facility immediately." (A57)

On defendants' motion, the District Court dismissed Key Equity's complaint for

---

[3] In a separate count, Key Equity alleged a violation of section 20(a) of the Exchange Act on the part of Sel-Leb's directors. Section 20(a) "imposes joint and several liability on any person who 'controls a person liable under any provision of the [Exchange Act].'" In re Alpharma Inc. Sec. Litig., 372 F.3d 137, 153 (3d Cir. 2004) (quoting Shapiro v. UJB Financial Corp., 964 F.2d 272, 279 (3d Cir. 1992)). As we affirm dismissal of the § 10(b) claim, we likewise affirm the dismissal of this claim. Id.

failure to state a claim on which relief could be granted, under Federal Rule of Civil Procedure 12(b)(6), and failure to plead facts with particularity, under Rule 9(b) and the PSLRA. The Court reached the following conclusions. Regarding the allegation that the company's financial statements did not conform to GAAP, Key Equity had not "alleged with any detail what principles . . . were violated by Defendants." (A16) Regarding the allegation that the company renegotiated its credit line because of financial trouble, Key Equity had relied merely on "information and belief," and thus did not plead with particularity. (A17) Regarding the allegations that the company had misstated its 2001 and 2002 earnings, Key Equity failed to plead with particularity facts giving rise to a "strong inference" of *scienter*. (A17-20) Finally, the Court concluded that all of the statements concerning the company's future financial health were "forward looking" and, therefore, did not give rise to liability. (A20-21)

On December 29, 2005, Key Equity filed a Notice of Appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291, and exercise plenary review over the District Court's order granting the defendants' motion to dismiss. Cal. Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 143 (3d Cir. 2004).

## II. Legal Background

"Section 10(b) of the Securities Exchange Act of 1934 forbids the 'use or employ, in connection with the purchase or sale of any security . . ., [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe . . . .'" Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct.

2499, 2507 (June 21, 2007) (quoting 15 U.S.C. § 78j(b)).  "Pursuant to this statutory

authority, the [SEC has] promulgated Rule 10b-5, which creates a private cause of action

for investors harmed by materially false or misleading statements."  In re Suprema

Specialties, Inc. Sec. Litig., 438 F.3d 256, 275 (3d Cir. 2006).[4]

        To state a claim for a violation of section 10(b), a plaintiff must plead the

following elements:  "(1) a material misrepresentation (or omission); (2) *scienter*, i.e., a

wrongful state of mind; (3) a connection with the purchase or sale of a security; (4)

reliance, often referred to in cases involving public securities markets

(fraud-on-the-market cases) as 'transaction causation;' (5) economic loss; and (6) 'loss

causation,' i.e., a causal connection between the material misrepresentation and the loss."

Id. (quoting Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341 (2005)).  In assessing the

sufficiency of § 10(b) pleadings, we "accept all factual allegations in the complaint as

true," and "consider the complaint in its entirety, as well as . . . sources courts ordinarily

examine when ruling on Rule 12(b)(6) motions to dismiss."  Tellabs, 127 S. Ct. at 2509.

        More importantly, in assessing the sufficiency of a § 10(b) claim, we also observe

the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the

---

        [4] The rule makes it unlawful "for any person '[t]o make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made[,] in light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security.'"  Id. (quoting 17 C.F.R. § 240.10b-5(b)).

PSLRA.[5]  Under these requirements, a plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, [a plaintiff must] state with particularity all facts on which that belief is formed."  In re Alpharma Inc. Sec. Litig., 372 F.3d 137, 147 (3d Cir. 2004) (quoting 15 U.S.C. § 78u-4(b)(1)(B)).  In other words, the complaint should set out the "who, what, when, where and how" of the events at issue.  DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990) (quoted in In re Advanta Corp. Sec. Litig., 180 F.3d 525, 534 (3d Cir. 1999)).

Regarding allegations of *scienter*, a plaintiff must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind."  In re Alpharma, 372 F.3d at 148 (quoting 15 U.S.C. § 78u-4(b)(2) (emphasis added)).  To do so, the complaint may allege (1) "facts to show that defendants had both motive and opportunity to commit fraud," or (2) "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  Id. (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir. 1997)). As the Supreme Court has made clear, a complaint gives rise to a "strong inference" of *scienter* "only if a reasonable person would

_____

[5] The purpose of Rule 9(b) is to "give defendants notice of the claims against them, provide an increased measure of protection for their reputations, and reduce[ ] the number of frivolous suits brought solely to extract settlements."  In re Suprema Specialties, 438 F.3d at 270 (internal quotation marks omitted).  The purpose of the PSLRA is "to restrict abuses in securities class-action litigation."  In re Advanta Corp. Sec. Litig., 180 F.3d 525, 531 (3d Cir. 1999).  To the extent that Rule 9(b) conflicts with the PSLRA, the statute supersedes it.  Id. at 531 n.5.

deem the inference of *scienter* cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 127 S. Ct. at 2510.

"Stated in another way, unless plaintiffs in securities fraud actions allege facts supporting their contentions of fraud with the requisite particularity mandated by Rule 9(b) and the [PSLRA], they may not benefit from inferences flowing from vague or unspecific allegations—inferences that may arguably have been justified under a traditional Rule 12(b)(6) analysis." In re Rockefeller Center Properties, Inc. Sec. Litig., 311 F.3d 198, 224 (3d Cir. 2002). If a complaint fails to meet the stringent pleadings requirements for sustaining a § 10(b) claim, the "appropriate sanction . . . is dismissal." In re Alpharma, 372 F.3d at 148; In re Rockefeller, 311 F.3d at 224 (citing 15 U.S.C. § 78u-4(b)(3)(A)).

### III. Discussion

On appeal, Key Equity offers four reasons for us to vacate the order of the District Court and reinstate its complaint. First, Key Equity argues that it did not have to plead with particularity "which provisions of GAAP had been violated in order to satisfy the pleading requirements of the PSLRA and Rule 9(b)." Br. at 9. Second, it argues that it "pleaded with particularity that defendants were in default of the $3.8 million credit facility with Merrill Lynch." Br. at 11. Third, it contends that its complaint sufficiently alleged "motive and opportunity" to satisfy the pleading requirements for *scienter*. Br. at 13. Finally, it contends that "defendants' press releases and financial statements" were not "forward looking" and were "thus not entitled to the PSLRA's safe harbor

protection." Br. at 15.

We reject these contentions and conclude that Key Equity's complaint fails to satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA.[6] We agree with the decision of the District Court primarily for two reasons.[7] First, almost all the statements identified by Key Equity were projections about the company's financial growth, or expressions of general optimism about its financial health. Such positive portrayals of the company, however, are not actionable under § 10(b). As we stated in <u>In re Advanta</u>, "vague and general statements of optimism 'constitute no more than 'puffery' and are understood by reasonable investors as such.'" 180 F.3d at 538 (quoting <u>In re Burlington Coat</u>, 114 F.3d at 1428 n.14). Accordingly, the company's optimistic statements that it was, for example, "slated to begin to generate strong revenue and earnings growth in 2002," do not give rise to liability under § 10(b).[8]

---

[6] For the purposes of brevity, we do not distinguish between defendants in our discussion of the issues. Notably, Key Equity does not do so on appeal. Its failure to specify which facts support a claim against which defendants—i.e., which defendants said and knew what at what time—supports our conclusion that the complaint is not pleaded with sufficient particularity.

[7] J.H. Cohn also points out that Key Equity failed to adequately plead "loss causation," i.e., that "the drop in the value of a security is related to the alleged misrepresentation." <u>Berckeley Inv. Group, Ltd. v. Colkitt</u>, 455 F.3d 195, 223 (3d Cir. 2006). Although it appears that no facts establish a causal connection between the misstatements and the decline in the value of the stock, we, like the District Court, need not reach this issue.

[8] To the extent these statements could be considered materially misleading to a reasonable investor, they were "identified as . . . forward-looking" and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. §

-10-

Second, although the District Court concluded that the complaint adequately identified Sel-Leb's earnings statements for 2001 and the first half of 2002 as materially misleading,[9] it concluded that Key Equity had failed to accompany these statements with sufficient allegations of *scienter*. In order to establish *scienter*, Key Equity relies on the defendants' "motive and opportunity" to commit fraud. Presumably, the inference we are to draw is that defendants had a motive to fraudulently misstate earnings because Sel-Leb needed the Merrill Lynch line of credit to operate. Because the company could not meet the requirements for sustaining this line of credit, defendants decided to overstate Sel-Leb's 2001 and 2002 earnings. Moreover, by stating that it was only "renewing" the credit line, the defendants attempted to disguise the company's deteriorating financial condition from investors.

We conclude that these allegations have been pleaded with insufficient particularity to meet the heightened pleading requirements of Rule 9(b) and the PSLRA. Specifically, the facts allegedly supporting a strong inference of *scienter* have not been adequately pled.[10] As the Supreme Court recently stated, "omissions and ambiguities

78u-5(c)(1)(A)(i).

[9] We observe that, arguably, the complaint fails to adequately plead that the earnings statement for the first six months of 2002 was misleading. A $3.8 million loss for the year as a whole is not necessarily inconsistent with gains in the first half of that year. In fact, the press releases indicate that in the latter portion of 2002 a large number of orders could not be filled, leading to financial difficulties. (A43)

[10] We also note that the complaint sets out nothing more than an ordinary business motive, which is typically insufficient to support a strong inference of fraud. See GSC Partners CDO Fund v. Washington, 368 F.3d 228, 237 (3d Cir. 2004) ("Motives that are

-11-

count against inferring *scienter*, for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" Tellabs, 127 S. Ct. at 2511 (quoting 15 U.S.C. § 78u-4(b)(2)).

In this case, although Key Equity alleges that Sel-Leb falsified its earnings to maintain its credit line, its complaint is bereft of any facts or details supporting this conclusion. We are therefore left to speculate about what particular information was hidden, what financial figures were manipulated, and when any of the defendants knew of or implemented such fraudulent devices. Cf. In re Burlington Coat, 114 F.3d at 1417-18 ("[W]here plaintiffs allege that defendants distorted certain data disclosed to the public by using unreasonable accounting practices, we have required plaintiffs to state what the unreasonable practices were and how they distorted the disclosed data."). Inferring *scienter* in these circumstances would impermissibly provide Key Equity the "benefit [of] inferences flowing from vague or unspecific allegations." In re Rockefeller, 311 F.3d at 224. In other words, because of the complaint's omissions, it fails to set out the "who, what, when, where and how" of the events at issue. DiLeo, 901 F.2d at 627.[11]

_____

generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from this fraud.") (internal quotation marks omitted).

[11] Our dissenting colleague relies on the tightening of Merrill Lynch's credit line as a motive to commit fraud. The complaint states only that, on information and belief, Sel-Leb had to renegotiate its credit line because it could not repay certain obligations to Merrill Lynch. (A53) With this allegation alone, an inference that defendants renegotiated Sel-Leb's credit line in the ordinary course of business (when it was up for renewal) is more likely than an inference of *scienter*. See Tellabs, 127 S.Ct. at 2513.

Furthermore, we conclude that the complaint fails to adequately plead facts "that constitute strong circumstantial evidence of conscious misbehavior or recklessness." In re Alpharma, 372 F.3d at 148. To do so, Key Equity would have to allege "an extreme departure from the standards of ordinary care [that] presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." In re Advanta, 180 F.3d at 535 (quoting McLean v. Alexander, 599 F.2d 1190, 1197 (3d Cir. 1979)). Although Key Equity does not appear to pursue a recklessness theory on appeal, its complaint nonetheless fails to satisfy the requirements for doing so. The mere fact of a misstatement is not evidence of recklessness, and Key Equity provides no detail to support a stronger conclusion than: there must have been fraud. We have previously rejected such conclusory pleading as precisely what the PSLRA was intended to weed out. GSC Partners CDO Fund v. Washington, 368 F.3d 228, 239 (3d Cir. 2004) ("Of course, it is not enough for plaintiffs to merely allege that defendants 'knew' their statements were fraudulent or that defendants 'must have known' their statements were false."); In re Advanta, 180 F.3d at 539 (rejecting as inadequate allegation that defendants "must have been aware of impending losses").[12]

---

[12] Our dissenting colleague would infer *scienter* from what he believes to be a 400% overstatement of Sel-Leb's 2001 earnings. We disagree with his calculations. As the record reveals, the original 2001 net earnings of $443,669 resulted from gross income of $21,451,140 and expenses (including taxes) of $21,007,471. The revised figure for that year reflected a reduction of about $1.8 million in pre-tax earnings. Assuming this $1.8 million is a reduction in Sel-Leb's gross income of over $21 million, the misstatement reflects an error of less than 10%. Cf. PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 686 (6th Cir. 2004) ("Accepting Plaintiffs' allegations as true, Intrenet

-13-

## IV. Conclusion

For the foregoing reasons, we conclude that Key Equity's complaint failed to meet

the heightened pleading requirements applicable to a securities fraud claim under § 10(b).

We therefore affirm.

―――――

represented itself as a barely profitable company, when in fact it was a barely unprofitable company. It simply cannot be said that Intrenet's accounting improprieties, by virtue of their type and size, should have been obvious."). In any event, the complaint provides insufficient details from which to determine what errors the misstatement resulted from, or whether any "red flags" had warned any of the defendants about them.

GARTH, Circuit Judge, dissenting:


I find it difficult to understand how the majority opinion can overlook the magnitude

of Sel-Leb's overstatement of earnings ($1.8 million) which was 400% below its reported

income in 2001. Moreover, I find it even more difficult to understand how the majority

opinion can overlook Sel-Leb's failure to disclose Merrill Lynch's significant modifications

to Sel-Leb's credit agreement because of Sel-Leb's precarious financial condition. The

majority opinion does so by characterizing Sel-Leb's rosy projections about its financial

health and future growth as "puffery." I cannot join in the majority's "puffery" analysis and

I therefore respectfully dissent.


I.


The facts alleged in the complaint, taken together with Sel-Leb's SEC filings which

we are permitted to consider on a motion under Rule 12(b)(6),[13] are more than sufficient to

---

[13]See Oran v. Stafford., F.3d 275, 289 (3d Cir 2000) (adopting the reasoning of "[a] number of our sister circuits [that] . . . in deciding a motion for judgment on the pleadings [we may] take judicial notice of properly-authenticated public disclosure documents filed with the SEC); see also Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991).

Moreover, I emphasize that this is a Fed. R. Civ. P. 12(b)(6) proceeding. In reviewing a dismissal for failure to state a claim, a judge must accept as true all of the factual allegations contained in the complaint and may take judicial notice of SEC documents. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S.Ct. 2499, 2509 (2007). As the

plead and satisfy a "strong inference" that the director defendants acted fraudulently and with

scienter as required under the Private Securities Litigation Reform Act of 1995 ("PSLRA").[14]

First, Merrill Lynch's repeated material modifications of Sel-Leb's loan agreements

in mid-2002 strongly point to the fact that Merrill Lynch was seriously concerned about Sel-

Leb's financial position.[15] I find it rather quixotic that in its effort to minimize Sel-Leb's

intent to commit fraud, the majority opinion recites in its footnote 11 – and without the

context, language, and facts found in paragraph 30 of the complaint – that Sel-Leb's

renegotiation of its credit line was no more than in the "ordinary course of business." The

majority opinion's footnote 11 states:

Supreme Court recently noted, "[t]he inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id*. (emphasis in original).

[14]I concur with the majority that the complaint was properly dismissed as to J.H. Cohn, Sel-Leb's auditor, on the grounds that it stood to gain no "concrete and personal benefit" from such misstatements. GSC Partners CDO Fund v. Washington, 368 F.3d 228, 237 (3d Cir. 2004); see also Rothman v. Gregor, 220 F.3d 81, 98 (2d Cir. 2000) (holding that an auditor may be found liable for recklessness in certifying financial misstatements only if its conduct was "highly unreasonable, representing an extreme departure from the standards of ordinary care [and] must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company").

[15]It is convenient for the majority opinion to infer that Sel-Leb's credit line was renegotiated only in the ordinary course of business. See maj op. n. 11. This is the same litany that Sel-Leb would have us believe. However, as I point out, what Sel-Leb did was bury its "renewal" to disguise the true purpose and effect of renegotiating its credit with Merrill Lynch. One need only take a cursory look at the modifications made by Merrill Lynch – which critically tightened Sel-Leb's credit (and were instituted not only once, but twice, in a span of four months) – to understand that this was no mere "ordinary course of business." This was financial desperation!

. . . The complaint states only that, on information and belief, Sel-Leb had to renegotiate its credit line because it could not repay certain obligations to Merrill Lynch. (A53) With this allegation alone, an inference that defendants renegotiated Sel-Leb's credit line in the ordinary course of business (when it was up for renewal) is more likely than an inference of *scienter*. See Tellabs, 127 S.Ct. at 2513.

However, paragraph 30 of the complaint in which the majority opinion finds comfort – *in full* alleges not just the last sentence cited by the majority – but rather those facts and details giving rise to the renegotiation of the credit agreement. Paragraph 30 of the complaint alleges that:

This disclosure [that fourth quarter 2002 sales would be substantially lower than projected] occurred shortly after defendants filed their quarterly report for the third quarter of 2002. Buried in the quarterly report was the disclosure that Sel-Leb had been required to renegotiate the

terms of a $3.8 million credit facility with Merrill Lynch Business Financial Services, Inc. ("Merrill Lynch") and to postpone its obligation to repay the $3,717,249 outstanding balance on the credit facility from October 31, 2002 to October 31, 2003. Upon information and belief, the Company had to renegotiate the terms of the credit facility with Merrill Lynch because it could not make the payment as required on October 31, 2002.

These concerns obviously caused Merrill Lynch problems. Despite these troubling concerns of Sel-Leb's principal lender, the director defendants reported in a November 18, 2002 press release that Sel-Leb was merely "pleased to announce" that it was "*renewing* [not renegotiating] our Operating Line of Credit." A42 (emphasis added). From the entire allegations (not just the last sentence) contained in paragraph 30 of the complaint, it appears that the director defendants had actual *knowledge*, to a far greater degree than they disclosed, of Sel-Leb's troubled financial position.

Second, the sheer size of Sel-Leb's overstatements – over 400% of earnings in fiscal year 2001 alone – are indicative of fraudulent intent. The complaint alleges that without these *enormous* overstatements of earnings (which actually were losses, not positive

-18-

income), Sel-Leb would have breached and defaulted on the terms of its credit agreement, causing Merrill Lynch to terminate its credit at once and "exercis[e] remedies available to it as a secured lender." Comp. ¶¶ 44-45. Would reasonable investors truly regard a misstatement of over 400% of reported income as mere "puffery?" Nor is it an answer to say that the 400% overstatement of earnings have been miscalculated as the majority claims in its footnote 12.

The majority opinion's hypothesis (evaluating the extent of revenues and expenses) as to the source of the misstatement – "a decrease of about 10%" of revenues – is nothing more than pure speculation since neither the record nor the SEC filings state the reason for the 400% overstatement of earnings.[16] All the record and the SEC filings reveal is that Sel-Leb turned from a profitable venture into a bankrupt company because, in part, its 2001 earnings were overstated by 400%. See A50; Sel-Leb Form 8-K, filed Feb. 24, 2004. To a reasonable investor, it is inconsequential whether such a significant misstatement of earnings retained by shareholders arises from an overstatement of revenues and/or an understatement of expenses.

The SEC documents and reports, which the majority opinion has taken pains not to

---

[16]The majority opinion could have attempted to further dilute the size of the 400% earnings misstatement by speculating that it resulted from a 4.2% overstatement of revenues and a 4.3% understatement of expenses (both percentages equaling in total to about $1.8 million of the misstated net earnings).

address, disclose that Sel-Leb was not a "barely unprofitable company" (see maj. op. n. 12) but was rather in deep financial trouble – trouble which it chose not to disclose to its investors or to Merrill Lynch. Moreover, by affirming the erroneous dismissal of Key Equity's complaint the majority has now precluded Key Equity from providing by proofs the further facts and details as to Sel-Leb's losses and its fraud.

Finally, the need to falsify Sel-Leb's asset statements in order to prevent a default leading to an end of its crucial credit line constitutes a motive to commit fraud that is probative of scienter. In this regard, the complaint alleges that "[d]efendants were motivated to issue materially false statements . . . in large part to maintain the credit facility with Merrill Lynch. Had Merrill Lynch discovered the adverse information about the Company earlier, it would have called for termination of the credit facility immediately." Comp. ¶ 45. Such motivation provides further probative support for plaintiffs' assertion that the director defendants acted with fraudulent intent.

These allegations, separately and particularly in combination, adequately plead a "strong inference" of scienter as required by the PSLRA.

II.

The majority opinion states that Key Equity's allegations in its complaint have not

been adequately pled and are "bereft of any facts or details supporting" the conclusion that Sel-Leb concealed its financial condition to maintain its credit line.  Maj. op. p. 12.  Let's examine what Key Equity really and factually charged.

### *Sel-Leb's Failure to Disclose Modifications of its Credit Agreement*

Sel-Leb's Form 10-KSB contained, as an attachment, a loan agreement dated November 8, 1999, under which Merrill Lynch agreed to provide a revolving line of credit to Sel-Leb.  One of the covenants contained in this loan agreement, under the heading "Minimum Tangible Net Worth," required that "Customer's 'tangible net worth' shall at all times exceed $6,500,000.00."  A27.  In 2002, amidst Sel-Leb's now evident catastrophic losses, Merrill Lynch modified the loan agreement two times.  On June 6, 2002, Merrill Lynch increased the tangible net worth requirement to $8 million.  A28.  *Just four months later*, on October 18, 2002, the tangible net worth requirement was further increased to $8.5 million.  A29.

Sel-Leb *did not report* either of these modifications in its subsequent August 15, 2002 or September 13, 2002 press releases that accompanied its second quarter 2002 or third quarter 2002 financial reports.  Finally, in a November 18, 2002 press release, Sel-Leb cheerfully reported that it was "pleased to announce that we have signed an agreement with our major lending institution, *renewing* our Operating Line of Credit through October 31,

2003." A42 (emphasis added). This announcement made no mention of nor did it contain any indication of the changes to Sel-Leb's loan agreement. Moreover, the very term "renewing" used by Sel-Leb to characterize the modifications to its loan agreement was itself misleading and fraudulent. The complaint alleges that this was not a renewal but at best a significant renegotiation. Comp. ¶ 30. (Puffery?).

The November 18, 2002 press release also reported positive earnings for the nine months ended September 30, 2002, and stated "we expect to continue to show growth in both sales and earnings for the fiscal year 2002." Id. It was only later that Sel-Leb disclosed that it had sustained a $3.8 million loss for fiscal year 2002. Comp. ¶¶ 39-40.

The allegations containing and referring to these facts demonstrate that the director defendants had actual knowledge or at the very least behaved recklessly with respect to Sel-Leb's deteriorating financial condition. Merrill Lynch's fears – as expressed by its decisions to twice modify Sel-Leb's loan covenants – were obvious warnings putting the director defendants on notice of Sel-Leb's seriously unstable financial condition. Even more revealing of the director defendants' state of mind, however, is the misleading manner by which Sel-Leb reported the extension of its credit facility – i.e., that it was "pleased" to be "renewing" the facility – without so much as a hint that in fact Merrill Lynch had twice within the last five months materially tightened the terms of Sel-Leb's credit. Comp. ¶¶ 30, 36, 45, 54. These allegations and facts are alone sufficient to create a strong inference of

scienter permitting this case to go forward.

The director defendants argue that "the reason why Sel-Leb had to renegotiate the terms of the credit facility on October 31, 2002 . . . was because October 31st was the annual date for renewal of the credit facility." Def. Br. at 23. This still fails to explain why the materially adverse renegotiated terms were not disclosed. Instead, the director defendants whitewashed those changes with a report that Sel-Leb's credit facility had merely been "renew[ed]." Comp. ¶ 30. In any event, the issue whether the October 31, 2002 extension was simply an annual renewal or, as Key Equity maintains, "a renegotia[tion] . . . because [Sel-Leb] could not make the payment as required on October 31, 2002" is a matter for discovery, not resolution on a motion under Rule 12(b)(6). Id. The allegations amply reveal that the actions of the director defendants were not the result of unfortunate business conditions, but were rather fraudulent efforts to disguise Sel-Leb's failing enterprise.

III.

### *Size of Misstatements and Errors in Financial Reports*

The inference of scienter here is further heightened by the sizable magnitude of the overstatements in Sel-Leb's 2001 and 2002 financial statements. According to the complaint, Sel-Leb's pre-tax earnings for fiscal year 2001 were overstated by $1.8 million,

-23-

and were thus actually *over 400%* below Sel-Leb's $443,669 reported 2001 income. Comp. ¶¶ 41, 44. And, while reporting positive pre-tax income of $339,000 for first quarter 2002 and positive, though declining, pre-tax income of $418,370, and $132,276 for the six and nine month periods ending June 30, 2002 and September 30, 2002, Sel-Leb later admitted *no income* for those periods but rather a $3.8 million *loss* for fiscal year 2002. Comp. ¶¶ 24, 26, 40, 44. These facts can hardly be called "puffery" or a vague and general statement of optimism (maj. op. p. 10-11) or forward-looking (maj. op. n. 8).

The magnitude of the overstatements in corporate financial statements has repeatedly been held to constitute corroborating circumstances of fraudulent intent. See Gen. Elec. Capital Corp. v. Acosta (In re Acosta), 406 F.3d 367, 372 (5th Cir. 2005) ("An intent to deceive may be inferred from "reckless disregard for the truth or falsity of a statement combined with the *sheer magnitude of the resultant misrepresentation.*") (emphasis added); PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 684 (6th Cir. 2004) ("[A]n inference of knowledge or recklessness may be drawn from allegations of accounting violations that are so simple, basic, and pervasive in nature, and *so great in magnitude*, that they should have been obvious to a defendant.") (emphasis added); In re MicroStrategy, Inc. Sec. Litig., 115 F. Supp. 2d 620, 637 (D. Va. 2000) ("[T]he . . . restatements are of such a great magnitude – amounting to a night-and-day difference with regard to MicroStrategy's representations of profitability – as to *compel an inference* that fraud or recklessness was afoot.") (emphasis

added).[17]

Here, Sel-Leb overstated its earnings by over 400% in 2001 and reported hundreds of thousands of dollars in earnings in 2002 while in reality sustaining a massive $3.8 million loss. The enormity of these overstatements, taken together with the serious consequences the director defendants knew would result from a disclosure that Sel-Leb breached the covenants in its credit facility, are prime indicia of scienter under the PSLRA and Rule 9(b).

IV.

---

[17]See also Rothman v. Gregor, 220 F.3d 81, 92 (2d. Cir. 2000) (agreeing that the magnitude of write-offs involved "renders less credible" defendants' argument that they acted without scienter); In re Baan Co. Sec. Litig., 103 F. Supp. 2d 1, 21 (D.D.C. 2000) (observing that "the magnitude of the error can play a role" in inferring scienter); In re Ancor Communiations, Inc., 22 F. Supp. 2d 999, 1005 (D. Minn. 1998) (finding support for a strong inference of conscious behavior from a company's substantial overstatements of revenues); In re First Merchants Acceptance Corp. Sec. Litig., No. 97-C-2715, 1998 U.S. Dist. LEXIS 17760, at *30-*31 (N.D. Ill. Nov. 4, 1998) ("Other circumstances suggesting fraudulent intent can include . . . the magnitude of the fraud alleged."); Carley Capital Group v. Deloitte & Touche, L.L.P., 27 F. Supp. 2d 1324, 1339 (N.D. Ga. 1998) (holding that a misapplication of GAAP "when combined with a drastic overstatement of financial results can give rise to a strong inference of scienter"); Rehm v. Eagle Fin. Corp., 954 F. Supp. 1246, 1255 (D. Ill. 1997) (citing the defendants' 91% overstatement of revenues as an "egregious miscalculation of credit losses" indicative of fraudulent intent); Marksman Partners, L.P. v. Chantal Pharm. Corp., 927 F. Supp. 1297, 1314 (D. Cal. 1996) ("The facts that the allegedly overstated revenues constituted such a significant portion of Chantal's total revenues . . . tend[s] to support the conclusion that the defendants acted with scienter.").

We have held that scienter may be adequately pleaded either (1) by "alleging facts establishing a *motive* and an *opportunity* to commit fraud;" or (2) by "setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior." In re Advanta Corp. Sec. Litig., 180 F.3d 525, 534-35 (3d Cir. 1999). As discussed above, the plaintiffs here have alleged "conscious behavior" in that the director defendants knew of Merrill Lynch's concerns and concealed those concerns by reporting merely that Sel-Leb's credit facility had been "renew[ed]." But the complaint also alleges that the director defendants had the "motive and opportunity" to commit fraud. In particular, the complaint asserts that the director "[d]efendants were motivated to issue materially false statements . . . in large part to maintain the credit facility with Merrill Lynch." Comp ¶ 45. Such motivations are highly probative of an intent to defraud. Allegations that a company's life hinges upon a credit facility, and that its lender is growing concerned about the company's financial state – coupled, as here, with severely overstated financials – present a starkly different scenario than the sort of generalized and commonplace motivations that the majority opinion finds to warrant dismissal under Rule 12(b)(6). The present complaint alleges that (1) absent financial overstatements, a corporation would default on a credit facility necessary to its survival; and (2) anxious lenders are repeatedly stiffening the terms of loan covenants, suggest a more specific and less common motivation and, therefore, are more probative of fraudulent intent.

Several courts have found such allegations probative of scienter. In Howard v.

Everex Sys., 228 F.3d 1057 (9th Cir. 2000), the court found scienter had been sufficiently established through plaintiffs' evidence that "Everex had a motivation to overstate its net value so as not to violate loan covenants with its principal lender CIT." Id. at 1064. Everex's lender had required it to maintain a net worth of $90 million and at the end of fiscal year 1991, Everex had a net worth of $92.1 million. The court stated that, given Everex's "projected possible first quarter FY1992 losses of $2.1 million, resulting in a net worth of exactly $90 million," the defendant director and CEO had the incentive to overstate Everex's value." Id. The court concluded that "the demonstration of [the defendant's] possible motive, combined with the red flags of Everex's financial condition, are sufficient to withstand a motion for JMOL." Id.[18]

Similarly, in PR Diamonds, Inc. v. Chandler, 364 F.3d 671 (6th Cir. 2004), the court found significant the plaintiffs' allegations that the defendants used improper accounting practices to forestall the company's impending default under certain financial covenants of its bank loan agreement:

> [T]he allegations that the Individual Defendants

---

[18] Howard arose in the context of a motion for judgment as a matter of law rather than on a motion to dismiss, in which context the Ninth Circuit has interpreted the PSLRA to discount allegations of motive and opportunity as a means of establishing scienter. See Fischer v. Vantive Corp.(In Re Vantive Corp. Secs. Litig.), 283 F.3d 1079, 1097 (9th Cir. 2002).

were motivated to engage in fraud in order to forestall Intrenet's default of its bank loan agreement and to preserve the Company's ability to borrow pursuant to its credit facility warrant closer scrutiny. *These more particularized sorts of motive allegations are more probative of scienter. For example, as part of the mix of factors contributing to an inference of scienter, the Ninth Circuit has considered a defendant's motivation to overstate a company's reported net value so as not to violate loan covenants with its lender and to improve the prospects of increasing its credit line.* Howard v. Everex Sys., Inc., 228 F.3d 1057, 1064 (9th Cir. 2000). We view the motive allegations concerning the bank loan and credit facility as suggestive of scienter, although standing alone they do not establish a strong inference.

Id. at 690 (emphasis added).

In the present case, the complaint's allegations that the director defendants were *motivated* to avoid defaulting on Sel-Leb's credit facility do not stand alone. Read together with Sel-Leb's SEC filings, the pleadings show that Merrill Lynch twice within a four-month period tightened Sel-Leb's loan covenants, the most plausible explanation for which is Merrill Lynch's concern about Sel-Leb's financial situation. The director defendants knew of these concerns but did not disclose them; in fact, the complaint alleges that the director defendants hid or "buried" those concerns, see Comp. ¶ 30 (*supra* n. 3), behind the pretense that the facility was being "renew[ed]." A42.

The question for us is not whether there are benign and "puffery" ways of interpreting these events; there may be many. Rather, the issue is whether plaintiffs have pled facts "rendering an inference of scienter *at least as likely* as any plausible opposing inference." Tellabs, 127 S.Ct. 2499, 2513 (2007) (emphasis in original). I would hold that they have met this burden, and have therefore properly and adequately pled the "strong inference" of scienter required under the PSLRA.

I therefore respectfully dissent from the majority's judgment, which upholds the district court's dismissal of plaintiffs' complaint pursuant to Fed. R. Civ. P. 12(b)(6) and thus precludes plaintiffs from proving the fraud and intent of the defendant directors – which plaintiffs have abundantly and appropriately alleged in the complaint.